# Exhibit B

## FRANCHISE AGREEMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**C.A. No. 6:13CV1067-HMH**



# MICHELIN RETREAD TECHNOLOGIES, INC.

# FRANCHISE AGREEMENT





# MICHELIN RETREAD TECHNOLOGIES, INC.
## FRANCHISE AGREEMENT

_Inter-City Retread, Inc._

FRANCHISEE

_777 Dowd Avenue_
_Elizabeth, NJ 07201_

SHOP ADDRESS

_November 1, 2005_

DATE OF AGREEMENT

| | | |
|---|---|---|
| 1. | INTRODUCTION | 1 |
| | 1.01 | Certain Definitions | 1 |
| | 1.02 | MRTI's Right to License | 4 |
| 2. | GRANT OF RIGHTS/TERM | 4 |
| | 2.01 | Type of Franchise/Location | 4 |
| | 2.02 | MRTI's Reservation of Rights | 5 |
| | 2.03 | MRTI's Liability Disclaimer | 5 |
| 3. | DEVELOPMENT OF THE SHOP | 5 |
| | 3.01 | Other Equipment and Supplies | 5 |
| 4. | TRAINING AND ASSISTANCE | 6 |
| | 4.01 | Supplemental Training Programs | 6 |
| | 4.02 | Operating Manual | 6 |
| | 4.03 | On-Going Guidance | 6 |
| | 4.04 | Sales Incentive Programs | 7 |
| 5. | MRTI RUBBER PRODUCTS | 7 |
| | 5.01 | Sale of MRTI Rubber Products | 7 |
| | 5.02 | Limited Warranty on MRTI Rubber Products | 7 |
| | 5.03 | Franchisee's Restriction on Purchase and Resale of MRTI Rubber Products | 8 |
| | 5.04 | Sale of Other Products and Supplies | 8 |
| 6. | SHOP OPERATING STANDARDS | 9 |
| | 6.01 | MRTI Equipment | 9 |
| | 6.02 | Condition of Shop | 9 |
| | 6.03 | MRTI Image | 9 |
| | 6.04 | Market Research | 9 |
| | 6.05 | Specifications and Standards | 10 |
| | 6.06 | Inspections | 10 |
| | 6.07 | Compliance With Laws | 10 |
| | 6.08 | Personnel | 11 |
| | 6.09 | Insurance | 11 |
| | 6.10 | Retail Prices | 12 |
| | 6.11 | National Warranty Programs | 12 |

| | | |
|---|---|---|
| 7. | MARKETING AND ADVERTISING | 13 |
| | 7.01 Local Advertising | 13 |
| | 7.02 Local Advertising Cooperatives | 13 |
| 8. | FINANCIAL AND ADMINISTRATIVE MATTERS | 13 |
| | 8.01 Royalty Fees | 13 |
| | 8.02 Method of Payment | 13 |
| | 8.03 Interest On Late Payments | 13 |
| | 8.04 Application of Payments and Offsets | 14 |
| | 8.05 Security Interest | 14 |
| | 8.06 Records and Computer Systems | 15 |
| | 8.07 Periodic Reports | 16 |
| | 8.08 Audits | 16 |
| 9. | TRADEMARKS | 16 |
| | 9.01 Ownership of the Marks | 16 |
| | 9.02 Use of the Marks | 17 |
| | 9.03 Discontinuance of Use of Marks | 17 |
| | 9.04 Notification of Infringements and Claims | 17 |
| | 9.05 Indemnification of Franchisee | 17 |
| 10. | RESTRICTIVE COVENANTS | 18 |
| | 10.01 Confidential Information | 18 |
| | 10.02 In-Term Covenants | 18 |
| | 10.03 Exception Regarding Performance of Competitive Services | 18 |
| | 10.04 Information Exchange | 19 |
| 11. | FRANCHISEE'S OWNERSHIP AND ORGANIZATION | 19 |
| | 11.01 Disclosure of Ownership Interests | 19 |
| | 11.02 Organizational Documents | 19 |
| 12. | TRANSFER OF THE FRANCHISE | 19 |
| | 12.01 Transfer By Franchisee Subject To MRTI's Approval | 20 |
| | 12.02 Conditions for MRTI's Approval | 20 |
| | 12.03 Disability or Death of Controlling Owner of Franchisee | 21 |
| | 12.04 MRTI's Right of First Refusal | 21 |
| | 12.05 Franchisee Bankruptcy | 22 |

12.06   Transfer by MRTI ................................................................................. 23

13.   TERMINATION OF AGREEMENT ............................................................ 23

13.01   Immediate Termination ........................................................................ 23

13.02   Termination by MRTI Upon Notice .................................................... 24

13.03   Termination by Franchisee Upon Notice ............................................ 25

14.   EFFECT OF TERMINATION OR EXPIRATION ...................................... 25

14.01   Payment of Amounts Owed to MRTI .................................................. 25

14.02   Discontinue Use of Marks and MRTI System .................................... 25

14.03   Continuing Obligations ....................................................................... 26

15.   RELATIONSHIP OF THE PARTIES .......................................................... 26

15.01   Independent Contractors ...................................................................... 26

15.02   Indemnification .................................................................................... 27

15.03   Taxes .................................................................................................... 27

16.   MISCELLANEOUS ..................................................................................... 28

16.01   Governing Law ..................................................................................... 28

16.02   Exclusive Jurisdiction ......................................................................... 28

16.03   Injunctive Relief .................................................................................. 28

16.04   Costs and Attorneys' Fees ................................................................... 28

16.05   Limitations on Legal Claims ............................................................... 28

16.06   Severability and Substitution of Provisions ........................................ 29

16.07   Waiver of Obligations .......................................................................... 29

16.08   Exercise of Rights ................................................................................ 29

16.09   Construction ......................................................................................... 30

16.10   Approvals and Consents ...................................................................... 30

16.11   Notices and Payments .......................................................................... 30

16.12   Force Majeure ...................................................................................... 31

16.13   Receipt of Offering Circular and Agreement ...................................... 31

16.14   Franchisee's Acknowledgments .......................................................... 31

16.15   Franchisee's Representations ............................................................... 31

:::

SCHEDULE 1                                          A-1
SCHEDULE 2                                          A-2
Personal Guaranty of Franchisee's Obligations      A-5
Personal Covenants                                 A-7
Exclusive Territory Rider                          A-8
MRTI Equipment Purchase Rider                       A-11

## MICHELIN RETREAD TECHNOLOGIES, INC.
## FRANCHISE AGREEMENT

THIS AGREEMENT ("Agreement") is made and entered into as of the _1st_ day of _November_ 20_05_ by and between **MICHELIN RETREAD TECHNOLOGIES, INC.**, a Delaware corporation, with offices at 632 Inglesby Parkway, Duncan, South Carolina 29334-9120 ("MRTI") and _Inter-City Retread, Inc._ , a(n) _New Jersey_ corporation, with its principal place of business located at _777 Dowd Avenue, Elizabeth, NJ 07201_ ("Franchisee").

## 1.    INTRODUCTION.

**1.01    Certain Definitions.** The terms listed below have the meanings which follow them and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

"Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise, as determined by MRTI in its Reasonable Business Judgment.

"Agreement Year" - Each twelve (12) month period starting on the Opening Date or an anniversary of the Opening Date.

"Competitive Business" - Any tire retreading facility or other business that uses a mold-cured, pre-cured or other similar technology for tire retreading or any other business that is the same as or similar to the Michelin Retread Shop concept, as it evolves or changes over time. Restrictions in this Agreement on competitive activities do not apply to the ownership of shares of a class of securities that are listed on a stock exchange or traded on the over-the-counter market and that represent less than five percent (5%) of that class of securities.

"Confidential Information" – Proprietary, confidential and trade secret information relating to the development and operation of Michelin Retread Shops, including: (a) the MRTI Process; (b) MRTI Equipment designs and layouts; (c) composition of MRTI Rubber Products; (d) marketing and sales programs for new and retreaded tires; (e) MRTI Rubber Products ordering and inventorying procedures; (f) knowledge of operating results and financial performance of Michelin Retread Shops, other than such shops owned by Franchisee; (g) methods for technical and sales training of personnel; (h) computer programs and systems; (i) tire adjustment data and analyses; (j) commercial and marketing information and strategies, and similar competitive commercial information; and (k) technical bulletins and any information, without regard to form, belonging to MRTI or licensed by it including, formulae, patterns, compilations, programs, devices, methods, techniques, or processes; provided, however, that "Confidential Information" shall not include any information which Franchisee can show: (l) is

generally known to the industry or the public through no act or fault of Franchisee (except when such information is used in a confidential and proprietary manner by MRTI), (ii) is received in good faith from any third party who has the right to disclose such information and who has not received such information, either directly or indirectly, from MRTI, or (iii) was in Franchisee's legitimate possession prior to the time of entering this Agreement.

"Marks" - The trademarks and service marks used to identify the products and/or services authorized by MRTI for use in accordance with this Agreement from time to time. Such Marks currently include MICHELIN® and associated logo, PRE-MOLD™ for the pre-cured process and CUSTOM MOLD™ for the mold-cured process.

"MRTI Equipment" - Equipment for inspecting, repairing and retreading tire casings, as specifically identified in Schedule 1, attached hereto and incorporated herein by reference, including all replacement parts, additions, repairs, software and accessories incorporated therein or attached thereto.

"MRTI Process" - Mold-cured and pre-cured truck tire retreading technology that uses: (a) patented and proprietary tire retreading processes; (b) MRTI Equipment for inspecting, repairing and retreading tire casings; (c) MRTI Rubber Products; and (d) proprietary work methods and procedures.

"MRTI Rubber Products" - Michelin Rubber and specially formulated related materials, such as cushion rubber, cushion gums and other adhesives, repair gums, filling materials, special extrusions, cements and other rubber materials which MRTI may modify, substitute or add to, as designated from time to time.

"MRTI System" - A comprehensive business system for using the MRTI Process in tire retreading shops which, in addition to the MRTI Process and the Marks, includes Confidential Information and certain other operational and business standards and policies, and all of which MRTI may further develop, improve or otherwise modify from time to time.

"Michelin Retread Shops" - Tire retreading facilities which MRTI or any authorized MRTI franchisee owns or operates and which use the MRTI System.

"Michelin Rubber" - Specially formulated MICHELIN® tread rubber and other tread rubber specified by MRTI.

"Opening Date" - For a new Shop just being installed pursuant to this Agreement, "Opening Date" means the date MRTI notifies Franchisee in writing that the Shop meets MRTI's requirements for opening pursuant to Section 3.02. For an existing Shop covered by a previous franchise agreement with MRTI, "Opening Date" means the date set forth in the first paragraph on page one of this Agreement.

"Operating Manual" - MRTI's confidential operating manual, as amended from time to time, which may consist of one or more manuals, containing certain Confidential Information, MRTI's mandatory and suggested standards and operating procedures relating to the

development and operation of Michelin Retread Shops and other information relating to Franchisee's obligations under the Transaction Documents. The term "Operating Manual" also includes alternative or supplemental means of communicating such information to Franchisee, including bulletins, videotapes, audio tapes, compact discs, computer diskettes, CD ROMs and electronic communications.

"Owner" - Each person who has a direct or indirect legal or beneficial ownership interest in Franchisee, if Franchisee is a business corporation, partnership, limited liability company or other legal entity.

"PMSI Collateral" – All MRTI Rubber Products sold to Franchisee on credit, together with any and all proceeds thereof, as contemplated in Section 8.05.

"Reasonable Business Judgment" - The standard applied by MRTI in the exercise of its rights, obligations and discretion under this Agreement, except otherwise indicated. Reasonable Business Judgment means MRTI's determinations shall prevail even in cases where other alternatives are reasonable, so long as MRTI is intending to benefit, or is acting in a way that could benefit the MRTI System or Michelin Retread Shops generally, to enhance the value of the Marks, increase customer satisfaction, or to minimize customer brand or location confusion (provided that MRTI shall always have the right to reduce, eliminate or modify a program or a benefit which it has voluntarily provided without obligation to do so under this Agreement). MRTI shall not be required to consider Franchisee's particular economic or other circumstances when exercising its Reasonable Business Judgment. Neither Franchisee nor any third party shall be entitled to substitute its judgment for a judgment that MRTI has made in its Reasonable Business Judgment.

"Shop" - The Michelin Retread Shop operated by Franchisee and the premises on which it is located, as identified in Section 2.01 pursuant to this Agreement.

"Transaction Documents" – This Agreement, any amendments or addenda thereto, any equipment leases, software licenses and equipment purchase agreements between the parties, the Michelin Dealer Sales Agreement, and any other agreement incorporating or incorporated into this Agreement.

"Transfer of the Franchise" - or similar words - The voluntary or involuntary, direct or indirect, sale, assignment, transfer or other disposition of this Agreement, any right under this Agreement, or any form of ownership or equity interest in Franchisee or the assets, revenues or income of the Shop or Franchisee, including: (a) any transfer, redemption or issuance of a legal or beneficial ownership interest in the capital stock of or other ownership interests in Franchisee; (b) any merger or consolidation of Franchisee, whether or not Franchisee is the surviving entity; (c) any sale, transfer or other disposition of the assets of the Shop, other than the sale of inventory in the ordinary course of business; (d) any transfer in, or as a result of, a divorce, insolvency, corporate or partnership or similar dissolution proceeding or otherwise by operation of law; (e) any transfer upon the death of Franchisee or any Owner of Franchisee by will, declaration of or transfer in trust or under the laws of intestate succession; or (f) any foreclosure

upon the Shop or the transfer, surrender or loss by Franchisee of possession, control or management of the Shop.

**1.02    MRTI's Right to License.**  MRTI has the right to use and sublicense the MRTI System for use at Michelin Retread Shops.

## 2.    GRANT OF RIGHTS/TERM.

**2.01    Type of Franchise/Location.**  Subject to the terms of this Agreement, MRTI grants Franchisee the right, and Franchisee assumes the obligation, to operate one Shop at the following identified premises 777 Druid Avenue, Elizabeth, NJ 07201 for a term starting on the date of this Agreement and expiring on the fifth anniversary of the Opening Date (the "Term"), provided that Franchisee may terminate this Agreement prior to its expiration in accordance with Section 13.03.

MRTI grants Franchisee the right, in connection with the Shop, to use that portion of the MRTI System and Marks authorized for:

[ X ]    the PRE-MOLD™ retreading process.

[ · ]    the CUSTOM MOLD™ retreading process.

[   ]    both the PRE-MOLD™ and CUSTOM MOLD™ retreading processes.

Franchisee is granted the right to use the MRTI Equipment, which is selected based on the type of retreading process authorized above, solely in connection with the Shop.

Franchisee's rights under this Agreement **are non-exclusive and** do not in any manner include area rights, market rights, territorial rights or a protected area.  MRTI is not restricted in any manner from licensing to others or operating itself other Michelin Retread Shops anywhere in the world including in the vicinity or market area of the Shop, as determined in its Reasonable Business Judgment.  Franchisee's rights hereunder are limited to using the MRTI Equipment and MRTI System only at the Shop, and Franchisee may not relocate the Shop or the MRTI Equipment without MRTI's prior written consent.  This Agreement does not grant or imply any option, right of first refusal or similar right to acquire additional franchises for Michelin Retread Shops.  Franchisee has no unilateral right to renew this Agreement or to extend its Term on expiration.  Instead, subject to applicable law, if both parties determine to extend their relationship, they may do so on such terms and conditions as mutually agreed.

**2.02    MRTI's Reservation of Rights.**  Except as otherwise expressly provided in this Agreement, MRTI, for itself and on behalf of its Affiliates, retains all rights and discretion with respect to the Marks, the MRTI Process, the MRTI Equipment, the MRTI System and Michelin Retread Shops anywhere in the world, including, the right to:

(a)    operate, and grant to others the right to operate, Michelin Retread Shops at such locations and on such terms and conditions as MRTI deems appropriate;

(b)    offer and sell to any party products and services identified by the Marks or other trademarks or service marks, including new tires, repaired tires, retreaded tires, used tire casings and, tire repair services, at any location anywhere in the world. Franchisee expressly acknowledges and agrees that MICHELIN® truck tire dealers or MICHELIN® passenger car tire dealers may currently or in the future be located in close vicinity of the Shop;

(c)    amend, modify and discontinue any programs or policies offered in connection with this Agreement;

(d)    test market new concepts or products at one or more Michelin Retread Shops or elsewhere without having to grant Franchisee any right to use such concepts or products; and

(e)    operate, and grant to others the right to operate, tire retreading facilities identified by trademarks or service marks, other than the Marks, pursuant to such terms and conditions as MRTI deems appropriate.

**2.03    MRTI's Liability Disclaimer.** MRTI's authorization to operate a Michelin Retread Shop from the particular premises of the Shop does not constitute a warranty or representation of any kind, express or implied, as to the suitability of such premises for a Michelin Retread Shop or for any other purpose. MRTI's authorization merely signifies that MRTI is willing to grant a franchise for a Michelin Retread Shop located at the identified premises. Franchisee's decision to develop and operate a Michelin Retread Shop is based solely on its own independent investigation and judgment of the suitability of the premises of the Shop.

## 3.    DEVELOPMENT OF THE SHOP.

**3.01    Other Equipment and Supplies.** Franchisee is responsible for purchasing or leasing all required equipment (other than MRTI Equipment), fixtures, supplies and signs for the Shop. Franchisee agrees to purchase or lease supplies, signs and equipment, other than MRTI Equipment, of such types, brands and models which meet MRTI's standards and specifications. Franchisee may purchase or lease such types, brands or models of supplies, signs and other equipment only from suppliers acceptable to MRTI. MRTI may from time to time modify the list of accepted types, brands, models of such supplies, signs, equipment and/or suppliers and Franchisee may not, after receipt of notice of such modification, reorder any type, brand or model, or from any supplier, which is no longer accepted.

If Franchisee proposes to purchase or lease any supplies, signs or equipment, other than MRTI Equipment, of a type, brand or model, or from any supplier, that is not currently accepted by MRTI, Franchisee agrees to notify MRTI and submit such information as MRTI may request. MRTI has the right to charge reasonable fees to cover MRTI's costs in evaluating Franchisee's proposal. MRTI may prescribe procedures for the submission of requests for MRTI's acceptance and impose obligations on suppliers, which MRTI may require to be incorporated in a written agreement. MRTI may impose limits on the number of types, brands, models or suppliers for any items. Any use by Franchisee of any supplies, signs and equipment, other than MRTI Equipment, that MRTI has not approved is expressly prohibited and Franchisee shall bear all risks, liabilities, and consequences arising from the use of such items.

4.    **TRAINING AND ASSISTANCE.**

**4.01    Supplemental Training Programs.** After opening the Shop, MRTI may provide training (subject to reasonable limitations as to frequency, time and cost) to any new manager or key production personnel of the Shop and may also provide supplemental training programs at such time(s) and place(s) as MRTI may designate. MRTI may require managers and all key production personnel to attend and satisfactorily complete such supplemental training programs. MRTI may assess reasonable charges for any such training programs. Franchisee will be solely responsible for all compensation, travel, lodging and living expenses incurred in connection with attending any such training programs.

**4.02    Operating Manual.** MRTI will loan Franchisee one or more copies of the Operating Manual. Franchisee agrees to comply fully with all mandatory standards and operating procedures and other obligations contained in the Operating Manual. MRTI may modify the Operating Manual to reflect changes in authorized products and services, standards and operating procedures and other obligations of Franchisee, provided no addition or modification may alter Franchisee's fundamental status and rights under the Transaction Documents. Mandatory standards and operating procedures and other obligations that MRTI prescribes in the Operating Manual, or otherwise communicates to Franchisee in writing, constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement or the Transaction Documents include all such mandatory standards and operating procedures and other obligations. Franchisee agrees to keep its copies of the Operating Manual current. Franchisee shall return to MRTI or destroy, as instructed by MRTI, all obsolete copies of the Operating Manual, or portions thereof. If a dispute develops relating to the contents of the Operating Manual, MRTI's master copy of the Operating Manual will control. The Operating Manual contains Confidential Information, and Franchisee agrees not to copy any part of the Operating Manual nor to disclose the information contained therein, or to use the information contained therein, in violation of Section 10 of this Agreement. Franchisee shall immediately notify MRTI of the loss or theft of the Operating Manual, or any portion thereof, shall furnish MRTI a full report of the circumstances of the loss or theft, shall fully cooperate with MRTI in any efforts to retrieve the Operating Manual, and shall take all steps necessary to avoid any future loss or theft.

**4.03    On-Going Guidance.** MRTI will furnish Franchisee periodic guidance with respect to the MRTI Process authorized hereunder, including improvements and changes to the MRTI System. Such guidance, at MRTI's discretion, may be in the form of the Operating Manual, bulletins or other written materials, telephonic consultations or consultations at MRTI's offices or at the Shop or by any other means of communication. At Franchisee's request, MRTI may provide special assistance for which Franchisee may be required to pay per diem fees and charges. All such guidance and assistance will be deemed Confidential Information, subject to the provisions of Section 10 hereof.

**4.04    Sales Incentive Programs.** MRTI will offer to Franchisee such sales incentive programs as MRTI in its sole discretion determines to be appropriate. Such programs may include various incentives to Franchisee for achieving MRTI-established sales goals of retreaded tires using the MRTI Process and/or achieving MRTI-established purchase goals of MRTI

Rubber Products. All such programs and data will be deemed Confidential Information, subject to the provisions of Section 10 hereof.

## 5. MRTI RUBBER PRODUCTS.

**5.01** <u>Sale of MRTI Rubber Products.</u> MRTI shall make available to Franchisee the standard line of MRTI Rubber Products. Franchisee agrees to maintain at the Shop an inventory of MRTI Rubber Products sufficient in quantity to satisfy reasonable customer demand.

Provided Franchisee and all of its Affiliates are in compliance with this Agreement and all other agreements with MRTI and its Affiliates, MRTI shall sell or cause to be sold to Franchisee such reasonable quantities of MRTI Rubber Products as Franchisee may order from time to time, at such prices, with such warranties, if any, and on such shipping terms, credit arrangements and ordering, delivery and return policies and schedules, as MRTI may determine from time to time. To the extent the terms of any purchase order are inconsistent with the Agreement, this Agreement shall control.

Franchisee acknowledges and agrees that MRTI shall have complete discretion in allocating to Franchisee shipments of MRTI Rubber Products which may be in limited or short supply from time to time.

**5.02** <u>Limited Warranty on MRTI Rubber Products.</u> MRTI warrants that MRTI Rubber Products are manufactured according to MRTI's specifications and are free from defects in material and workmanship. MRTI's sole obligation under this limited warranty is limited to replacing, during a period of twelve months after delivery of such MRTI Rubber Products to Franchisee, any MRTI Rubber Products returned to MRTI which upon examination MRTI shall determine to have been defective. The foregoing limited warranty for materials and workmanship shall apply only when MRTI Rubber Products are shipped, handled and stored in accordance with MRTI's instructions. ALL OTHER WARRANTIES OF MRTI AND ANY OF ITS AFFILIATES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY MRTI RUBBER PRODUCTS, ARE SPECIFICALLY DISCLAIMED. Except as otherwise expressly provided herein, neither MRTI nor any of its Affiliates is responsible or liable for any direct, indirect, actual, incidental or consequential damages or losses resulting from defective MRTI Rubber Products.

**5.03** <u>Franchisee's Restriction on Purchase and Resale of MRTI Rubber Products.</u> Franchisee acknowledges and agrees that: (a) MRTI Rubber Products are manufactured by, or on behalf of, MRTI pursuant to special standards and specifications; (b) MRTI Rubber Products are, in the mind of the public, inextricably interrelated with the Marks and image of MRTI; and (c) the reputation and goodwill of Michelin Retread Shops is based upon, and can be maintained only by, the use of such MRTI Rubber Products in tires retreaded at Michelin Retread Shops. Therefore, Franchisee shall not purchase, use or sell any tread rubber, cushion rubber, cushion gum and other adhesives, repair gum, filling materials, special extrusions, cements or any other rubber materials whatsoever, other than MRTI Rubber Products purchased from MRTI. Further,

Franchisee may not purchase MRTI Rubber Products from any other Michelin Retread Shop without MRTI's prior written consent.

Franchisee shall only use MRTI Rubber Products for retreading tires using the MRTI Process authorized hereunder at the premises of the Shop, and Franchisee shall not use any rubber products or supplies, other than MRTI Rubber Products, in connection with the MRTI Process. Franchisee shall not, during the Term or thereafter, sell, transfer or otherwise dispose of any MRTI Rubber Products to any person or entity whatsoever, including other tire retreading facilities, except that Franchisee may, subject to MRTI's prior written consent, sell MRTI Rubber Products to other Michelin Retread Shops.

5.04    Sale of Other Products and Supplies.    MRTI may make available to Franchisee accepted types or brands of non-rubber products and supplies ("Other Products") that MRTI deems necessary in the operation of a Michelin Retread Shop. Franchisee may purchase Other Products from MRTI or other suppliers acceptable to MRTI. MRTI has designated a single supplier for certain Other Products and Franchisee must purchase the required Other Products from the exclusive supplier.

MRTI may modify the list of accepted types, brands and/or suppliers of Other Products from time to time, and Franchisee may not, after receipt of notice of such modification, reorder any Other Products from any supplier which is no longer accepted. If Franchisee proposes to purchase Other Products from any supplier, that is not then accepted by MRTI, Franchisee agrees to notify MRTI and submit a request for MRTI to accept such supplier and will provide such information as MRTI may request. MRTI has the right to charge reasonable fees to cover MRTI's costs in determining whether to accept such supplier. MRTI may prescribe procedures for the submission of requests for MRTI's acceptance and impose obligations on suppliers, which MRTI may require to be incorporated in a written agreement. MRTI may impose limits on the number of types, brands or suppliers for Other Products. Any use by Franchisee of non-accepted Other Products or supplies in the Shop is expressly prohibited, and Franchisee shall bear all risks, liabilities, and consequences arising from any such use.

## 6.    SHOP OPERATING STANDARDS.

**6.01    MRTI Equipment.** Franchisee agrees to use, operate and maintain the MRTI Equipment in a careful and proper manner in compliance with all applicable laws and regulations; all manufacturer's guidelines; and all specifications, standards and operating procedures prescribed by MRTI. Franchisee agrees, at its sole cost, to maintain the MRTI Equipment in good operating condition and in substantially the same condition as when installed, subject to normal wear and tear, and Franchisee shall furnish all labor, parts and devices required to keep the MRTI Equipment in such condition throughout the Term. Without limiting the generality of the foregoing, Franchisee shall be responsible for preventive maintenance (such as lubrication, cleaning, replacement of filters, belts and hoses) and minor repairs and replacements (such as switches, sensors, belts and hoses). Franchisee agrees to notify and consult with MRTI with respect to any major repairs to MRTI Equipment. Franchisee agrees to make such modifications and additions to the MRTI Equipment and to the Shop's layout as MRTI may require, including replacement of worn out or obsolete equipment. Franchisee may not make any alterations to the MRTI Equipment and/or use unauthorized software on or in connection with the MRTI Equipment without MRTI's prior written approval.

Franchisee agrees to undertake all required inspections of MRTI Equipment and, to the extent required by applicable law, post appropriate certificates of inspection or other evidence of approval. Franchisee further agrees: (a) to maintain and/or install such safety features on MRTI Equipment as are originally installed or are thereafter recommended by MRTI and in conformity with all applicable safety codes and regulations; and (b) not to alter any safety features on MRTI Equipment.

**6.02    Condition of Shop.** Franchisee agrees to maintain the Shop in a clean condition. Franchisee agrees to periodically repair the interior and exterior of the Shop and any appurtenant parking areas. Franchisee agrees to make promptly (and in no event later than 30 days after notice from MRTI) all repairs or replacements, and implement all procedures, specified by MRTI to correct any deficiencies contained in any inspection reports submitted to Franchisee pursuant to Section 6.06. If the Shop is damaged or destroyed by fire or other casualty, Franchisee shall initiate within 30 days (and continue until completion) all repairs or reconstruction to restore the Shop to its original condition.

**6.03    MRTI Image.** Franchisee agrees that the Shop will offer for sale tire retreading services and other products and services that MRTI determines to be appropriate from time to time for Michelin Retread Shops. Franchisee further agrees that it will not offer any products or services not then authorized by MRTI. The premises of the Shop will not be used for any purpose other than the operation of a Michelin Retread Shop in compliance with this Agreement without MRTI's prior written approval. Franchisee agrees that it will offer prompt, professionally competent, courteous and efficient service at the Shop.

**6.04    Market Research.** MRTI may conduct market research to determine customer trends and saleability of new products and services. Franchisee agrees to cooperate by participating in such market research programs, by test marketing new products and services in the Shop and by providing MRTI timely reports and other relevant information regarding such

market research. Such reports and activities are expressly deemed to be Confidential Information, subject to the provisions of Section 10 hereof.

**6.05    Specifications and Standards.**  Franchisee agrees to comply with all mandatory specifications, standards and operating procedures, as modified from time to time (whether contained in the Operating Manual, any inspection reports or any other written communication) relating to the appearance, function or operation of a Michelin Retread Shop or any aspect thereof, including: (a) categories and sizes of tires which can be retreaded using the MRTI Process; (b) standards, specifications and methods of preparing and retreading tires; (c) operating, maintenance and repair procedures relating to the MRTI Equipment; (d) sales and delivery procedures; (e) customer warranty, service and return policies; (f) advertising and promotional programs; (g) appearance and dress of employees; (h) safety, maintenance, appearance, cleanliness, standards of service and operation of the Shop; (i) specifications for, and accepted suppliers of, miscellaneous equipment and supplies; (j) minimum days and hours of operation; and (k) accounting and record keeping systems and forms. Such standards and procedures are expressly deemed to be Confidential Information, subject to the provisions of Section 10 hereof.

**6.06    Inspections.**  MRTI and its designated agents have the right at any time during business hours to: (a) inspect the Shop, including the MRTI Equipment; (b) observe, photograph, audio-tape and/or video tape the operations of the Shop; (c) interview personnel and customers of the Shop; (d) inventory the MRTI Equipment; (e) review Franchisee's maintenance records; (f) evaluate the productivity and serviceability of the MRTI Equipment; (g) conduct reviews of Franchisee's compliance with the MRTI System; and (h) show the Shop to prospective franchisees. Franchisee agrees to cooperate fully with such activities. MRTI may issue to Franchisee inspection reports upon conclusion of any such inspection. MRTI reserves the right to make unannounced inspections of the Shop.

**6.07    Compliance With Laws.**  Franchisee agrees to maintain in force in its name all required licenses, permits and certificates relating to the operation of the Shop. Franchisee agrees to operate the Shop in full compliance with all applicable Federal, state and local laws, ordinances and regulations, including those pertaining to equal employment, nondiscrimination and affirmative action including the provisions of Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, Executive Order 11246 of September 24, 1965, Section 503 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Toxic Substance Control Act, the Occupational Safety and Health Act, the National Labor Relations Act, the Immigration and Reform Act, and all binding rules, regulations and relevant orders issued pursuant thereto. If applicable, Franchisee shall also comply with the following regulations of the Office of Federal Contract Compliance Programs, Department of Labor: (a) 41 C.F.R. § 60 - 1.4  Equal Opportunity Clause; (b) 41 C.F.R. § 60 - 250.4  Affirmative Action Clause for Disabled Veterans and Veterans of Vietnam Era; and (c) 41 C.F.R. § 60 - 741.4  Affirmative Action Clause for Handicapped Workers.

Franchisee agrees to notify MRTI in writing within two business days after:  (a) the commencement of any legal or administrative action, or the issuance of any order of any court;

agency or other governmental instrumentality, which may adversely affect the development, occupancy or operation of the Shop or Franchisee's financial condition, or Franchisee's ability to comply with the terms of any of the Transaction Documents; (b) the delivery of any notice of violation or alleged violation of any law, ordinance or regulation; or (c) any default by Franchisee under any other agreements, including any loan agreements and leases. Franchisee assumes sole and complete responsibility for maintaining a safe work place and for complying with all OSHA and related federal, state and local laws. In all dealings with MRTI, as well as with Franchisee's customers, suppliers, lessors and the public, Franchisee agrees to adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct.

6.08    **Personnel.** Franchisee agrees that the Shop at all times shall be managed by a manager who has completed MRTI's initial training and all required supplemental training, and shall be staffed by a sufficient number of competent and properly trained and certified employees. Franchisee is responsible for hiring all employees of the Shop and is responsible exclusively for the terms of their employment, including compensation, and for their proper training and certification for their particular job functions. Franchisee is solely responsible for all employment decisions of the Shop, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether Franchisee received advice from MRTI on these subjects. Franchisee agrees to establish at the Shop an employee training and certification program on the MRTI Process and other production, marketing and administrative functions that meet MRTI's standards. Franchisee may not recruit or hire any person who is an employee of MRTI, any of its Affiliates or any other Michelin Retread Shop, without obtaining the employer's prior written consent.

6.09    Insurance. Franchisee agrees to purchase and maintain in force: (a) commercial general liability insurance, including product liability and completed operations, contractual liability and personal and advertising injury coverage of at least $2,000,000 in the aggregate and $1,000,000 per occurrence; (b) automobile liability coverage (including hired and non-owned coverage) of at least $1,000,000 per accident; (c) workers' compensation insurance of at least the statutory limits and employer's liability coverage of at least $1,000,000; (d) umbrella/excess liability insurance of at least $5,000,000 in the aggregate per occurrence; (e) general property insurance and comprehensive boiler and machinery insurance for the replacement value of the Shop and MRTI Equipment and PMSI Collateral; and (f) such other insurance policies or coverages (such as business interruption insurance) in such types and amounts as MRTI may require from time to time in writing. MRTI reserves the right from time to time to increase the minimum coverage amounts specified above. All insurance policies shall be issued by carriers rated A-, IX or better by A.M. Best or a comparable rating service acceptable to MRTI; shall contain such exclusions and maximum deductibles as MRTI may prescribe from time to time; shall name MRTI and its Affiliates as additional insureds or loss payees as determined by MRTI; shall provide sixty (60) days' prior written notice to MRTI of any material modification, cancellation or expiration of such policy; and shall include such other provisions as MRTI may require.

Franchisee shall furnish MRTI with evidence of such insurance coverage and payment of premiums as MRTI requires within 30 days after execution of this Agreement, and in any event, prior to the installation date of any MRTI Equipment and promptly upon any renewal or

replacement thereof. If Franchisee fails or refuses to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, MRTI, at its option and in addition to its other rights and remedies hereunder, may obtain such insurance coverage on Franchisee's behalf. If MRTI does so, Franchisee shall fully cooperate with MRTI in its effort to obtain such insurance policies and shall pay MRTI any costs and premiums MRTI incurs. Franchisee's obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance MRTI may choose to maintain, nor does it relieve Franchisee of its obligations under Section 15.02. MRTI's approval of the insurance obtained by Franchisee shall not constitute a guarantee as to the adequacy of the limits or types of coverage of such insurance.

**6.10   Retail Prices.** MRTI may offer guidance to Franchisee relating to prices for products and services sold from or through the Shop that in MRTI's Reasonable Business Judgment constitutes good business practice. No such guidance shall be deemed to impose on Franchisee any obligation to charge any fixed minimum price. Franchisee shall have the sole right to determine the prices to be charged by the Shop. Franchisee shall not enter into any agreement or arrangement, or engage in any concerted practice, with other Michelin Retread Shops or others, relating to the prices at which products or services will be sold by Franchisee or other Michelin Retread Shops.

**6.11   National Warranty Programs.** MRTI shall establish and maintain a national warranty program containing such policies and procedures as MRTI deems appropriate from time to time. Franchisee authorizes MRTI to charge Franchisee's account for warranty services performed by another Michelin Retread Shop or by an authorized Michelin dealer in new truck tires on any tire retreaded by Franchisee in such amounts as MRTI may determine from time to time to be appropriate for the national warranty program, and to credit Franchisee's account for warranty services performed by Franchisee on any tire retreaded by another Michelin Retread Shop in such amounts as MRTI may determine to be appropriate from time to time. Franchisee agrees to pay MRTI any net debit balances, and MRTI agrees to pay Franchisee any net credit balances, in Franchisee's account, at such times and on such conditions as MRTI determines from time to time.

Franchisee, acting on its own behalf, shall deliver to its customers national warranties on terms and conditions MRTI determines from time to time and on such forms as MRTI may furnish to Franchisee. Franchisee shall perform promptly all of the terms and conditions of all such warranties. Franchisee shall have sole responsibility for all such warranties (even though the terms and conditions have been established by MRTI) and for performance of any other warranties provided by Franchisee.

Franchisee agrees to comply with all policies and procedures on warranty programs established by MRTI, including performing warranty service on tires retreaded by other Michelin Retread Shops and keeping records with respect to Franchisee reimbursement claims. Franchisee acknowledges and agrees that all warranty and other services hereunder are performed by Franchisee as an independent contractor and not as an agent of MRTI.

NEITHER MRTI NOR ANY OF ITS AFFILIATES MAKES ANY WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE

MERCHANTABILITY OR SUITABILITY OF ANY TIRES RETREADED BY FRANCHISEE USING THE MRTI PROCESS OR OTHERWISE.

Franchisee has no authority to make and shall not make any warranty or representation to others on behalf of MRTI.

## 7.　MARKETING AND ADVERTISING.

**7.01　Local Advertising.** From time to time, MRTI may provide Franchisee, at reasonable charges, with point-of-sale materials and other marketing and sales materials for use in connection with the Shop. Franchisee agrees to submit to MRTI for its prior approval, samples of all advertising and promotional materials not prepared or previously approved by MRTI and which vary from MRTI's standard advertising and promotional materials. Franchisee may not use any advertising or promotional materials that MRTI has not approved. All of Franchisee's advertising and promotion shall be completely factual and shall conform to the highest standards of ethical advertising. Franchisee agrees to refrain from any business or advertising practice which may be injurious to MRTI's business, to the business of other Michelin Retread Shops or to the goodwill associated with the Marks.

**7.02　Local Advertising Cooperatives.** MRTI has the right to establish local and/or regional advertising cooperatives for Michelin Retread Shops in Franchisee's local or regional area, covering such geographical areas as MRTI may designate from time to time. Franchisee agrees to participate in such advertising cooperative(s) and its programs (other than price advertising, as to which Franchisee may choose not to participate) and abide by its by-laws. Franchisee agrees to contribute such amounts to the advertising cooperative(s) as the cooperative(s) determines from time to time in accordance with its by-laws. Any Michelin Retread Shops owned by MRTI located in such designated local or regional area(s) will participate and contribute to the cooperative(s) on the same basis as requested of Franchisee.

## 8.　FINANCIAL AND ADMINISTRATIVE MATTERS.

**8.01　Royalty Fees.** Franchisee agrees to pay MRTI periodic royalty fees equal to Two U.S. Cents (U.S. $00.02) per pound of Michelin Rubber purchased by Franchisee from MRTI. Franchisee agrees to pay the royalty fees in accordance with the terms of MRTI's invoices.

**8.02　Method of Payment.** MRTI may require that royalty fees and any other payments hereunder, including payments for MRTI Rubber Products, be effected, at Franchisee's expense, via check or through electronic debit/credit transfer of funds programs in accordance with the terms and conditions of the invoice. Franchisee agrees to sign such documents (including transfer authorizations) and do such things as MRTI deems necessary to facilitate electronic transfer of funds.

**8.03　Interest On Late Payments.** All amounts which Franchisee owes MRTI or any of its Affiliates shall bear interest after their due date at the maximum rate permitted by law or 24% per annum, whichever is lower. However, Franchisee's failure to pay all amounts when due constitutes grounds for termination of this Agreement, as provided in Section 13.

**8.04    Application of Payments and Offsets.**  Franchisee acknowledges and agrees that all royalty fees and payments for MRTI Rubber Products and other goods and services provided by MRTI or its Affiliates to Franchisee shall be paid to the party to whom the amount is due, as and when due, without any setoff, deduction, or prior demand therefor.  Notwithstanding any stipulation by Franchisee to the contrary or any allocations of debits or credits which MRTI or any Affiliate may make on its monthly statement of account to Franchisee, MRTI or such Affiliate shall have the right to apply any payments made by Franchisee or credits issued or due to Franchisee as MRTI or any Affiliate shall determine in its absolute discretion.  Without limiting the generality of the foregoing, Franchisee agrees that the obligation to pay for MRTI Rubber Products delivered to Franchisee is an independent obligation unaffected by any alleged non-performance, of whatever nature, by MRTI hereunder.

**8.05    Security Interest.**  Franchisee grants MRTI a first priority purchase money security interest in the PMSI Collateral as security for the payment in full of all obligations of Franchisee to MRTI arising out of Franchisee's purchase of the PMSI Collateral.  Absent a written agreement of the parties to the contrary, payments received by MRTI from Franchisee shall be credited in the order received first to the oldest unpaid MRTI Rubber Products invoice.  If MRTI designates any other Affiliate as a supplier of any MRTI Rubber Products, Franchisee agrees to grant a purchase money security interest in such products sold to Franchisee on substantially the same terms as contained in this Section and to execute such agreements and documents as MRTI may require in connection therewith.  MRTI will have the sole first priority lien on the PMSI Collateral.

Franchisee shall execute and deliver such other and further documents, including security agreements, financing and continuation statements, and execute, authenticate, and deliver such further documents, as MRTI may deem appropriate to grant, convey and perfect the respective security interests granted hereunder or under any other agreement with MRTI or its Affiliates.  If Franchisee fails to promptly execute and deliver such statements and documents to MRTI, Franchisee grants to any officer of MRTI, an irrevocable power of attorney to execute and file such statements and documents on Franchisee's behalf for the benefit of MRTI.  In any event, MRTI is hereby irrevocably authorized to file financing statements and amend them under the Uniform Commercial Code or other applicable law.  Except for the lien in favor of MRTI on the PMSI Collateral, Franchisee shall keep the PMSI Collateral free and clear of all taxes, liens and encumbrances, and shall not mortgage, pledge, grant or create any other security interest in the PMSI Collateral, until payment in full of the obligations to MRTI secured hereunder, and shall not transfer or otherwise dispose of the PMSI, Collateral, except for the sale in the ordinary course of business.  If Franchisee shall default, as described herein, on demand from MRTI, Franchisee shall assemble and deliver the PMSI Collateral and PMSI Collateral to MRTI.

Upon expiration or termination of this Agreement, or earlier if Franchisee fails to make full and timely payment of all obligations arising out of the purchase of MRTI Rubber Products then, in addition to such rights and remedies conferred by applicable law, MRTI shall have the authority to take possession of and sell or otherwise dispose of the PMSI Collateral or any part thereof.  If Franchisee shall default under any other obligation, indebtedness or liability to MRTI, or if Franchisee's rights or interests under this Agreement shall terminate, for whatever reason, or expire, and there shall be any unpaid obligation, liability or indebtedness of Franchisee to

MRTI, howsoever created, arising or evidenced, and whether direct or indirect, absolute or contingent, or due or to become due, then in addition to such rights and remedies conferred on MRTI by applicable law, MRTI shall have the authority to take possession of and sell, assign, lease or otherwise dispose of the PMSI Collateral or any part thereof.

Any such disposition of the PMSI Collateral or the PMSI Collateral may be at public or private sale, provided MRTI shall give Franchisee at least five days prior written notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The net proceeds realized upon any such disposition, after deduction for the expenses of assembly, repossession, holding, preparing for sale, selling or the like and reasonable attorneys' fees incurred by MRTI, shall be applied to the payment of the liabilities, indebtedness and obligations secured by the PMSI Collateral as MRTI may elect. MRTI will account to Franchisee for any surplus realized on such disposition and Franchisee shall remain liable for any deficiency, which Franchisee shall pay forthwith. Alternatively, MRTI may retain the PMSI Collateral in satisfaction of the liabilities, indebtedness and obligations secured by such collateral, as provided by applicable law.

**8.06    Records and Computer Systems.** Franchisee agrees to prepare and maintain during the Term complete and accurate books, records and accounts for the Shop (including records of purchasing raw materials, work-in-process, finished goods, MRTI Equipment, production, labor and overhead, adjustments and sales) in accordance with MRTI's requirements, copies of Franchisee's sales tax returns and such portions of Franchisee's state and federal income tax returns as are related to the Shop. All such books and records shall be kept at the premises of the Shop, unless MRTI otherwise approves.

Franchisee agrees to record sales on a computer system. In order for Franchisee to be able to maintain records in a manner satisfactory to MRTI, it is understood that Franchisee may be requested to purchase or lease such computer hardware and software, required dedicated telephone and power lines, modems, printers, and other computer-related accessories or peripheral equipment as MRTI may recommend from time to time, for the purpose of, among other functions, recording sales, other record keeping and central functions and providing periodic reporting specified by MRTI. If MRTI requests Franchisee to lease from MRTI computer hardware and/or to use MRTI's confidential software, Franchisee may be requested to execute and comply with such lease and/or license agreements as MRTI deems necessary to protect its interests, and to pay MRTI such lease and/or license and maintenance fees as MRTI deems reasonably appropriate, and Franchisee shall make no unauthorized copies of such software.

Franchisee agrees to provide such assistance as may be required to connect Franchisee's computer system with MRTI's computer system. MRTI shall have the right from time to time and at any time to retrieve such data and information from Franchisee's computer system as MRTI, in its sole discretion, deems necessary or desirable, with the cost of such telephonic retrieval to be borne by Franchisee. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, Franchisee agrees to strictly comply with MRTI's standards and specifications for all items associated with Franchisee's computer systems.

15

To ensure full operational efficiency and optimum communication capability between and among computer systems installed by all Michelin Retread Shops, Franchisee agrees at its expense, to keep its computer system in good condition, and to promptly install such additions, changes, modifications, substitutions or replacements to hardware, software, telephone and power lines, and other computer-related facilities, as MRTI directs. Although MRTI has no obligation to assist Franchisee in obtaining these items, MRTI may suggest suppliers and provide other assistance as it deems appropriate.

**8.07    Periodic Reports.** Franchisee shall furnish MRTI: (a) no later than 30 days after the end of each month, an income statement and statement of cash flow for the Shop for that month and for the year-to-date and a balance sheet for the Shop as of the end of that month; (b) within 90 days after the end of each calendar year, an audited year-end balance sheet and income statement and statement of cash flow of the Shop and of the corporation or entity operating the Shop for that year, reflecting all year-end adjustments and accruals; (c) weekly production data, monthly labor and overhead data and monthly adjustment data; and (d) such other information as MRTI may require from time to time, including sales, income or property tax returns or statements. Franchisee agrees to certify by its signature that the information in each such financial statement or report is complete and accurate. All reports by Franchisee shall conform to MRTI's reporting standards.

**8.08    Audits.** MRTI reserves the right at any time during business hours and without prior notice to inspect, copy and audit the books, records, tax returns and documents relating to the development, ownership, lease, occupancy or operation of the Shop. Franchisee agrees to cooperate fully with MRTI's representatives and independent accountants conducting such audits.

## 9.    TRADEMARKS.

**9.01    Ownership of the Marks.** Franchisee acknowledges that an Affiliate of MRTI owns the Marks. Franchisee's right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Any unauthorized use of any of the Marks by Franchisee constitutes a breach of this Agreement and an infringement of the rights of MRTI's Affiliate to the Marks. This Agreement does not confer on Franchisee any goodwill or other interests in the Marks. Franchisee's use of the Marks and any goodwill established thereby inures to the exclusive benefit of MRTI's Affiliate. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks and service marks MRTI authorizes Franchisee to use. Franchisee may not at any time during or after the Term contest the validity or ownership of any of the Marks, nor assist any other person in contesting the same.

**9.02    Use of the Marks.** Franchisee agrees to use the Marks as MRTI prescribes in connection with the sale of authorized products and services. Franchisee may not use any Mark (or any abbreviation, modification or colorable imitation thereof) as part of any corporate or legal business name or in any other manner not expressly authorized by MRTI in writing. Franchisee agrees to use the Marks for purposes of identification of itself at the Shop as a provider of MRTI and/or Michelin branded goods and services, provided Franchisee identifies

itself as the independent owner thereof in the manner MRTI prescribes. Franchisee agrees not to take or condone any action which might adversely affect the goodwill or image associated with the Marks. Franchisee agrees to meet all MRTI standards with respect to the Marks that are set forth by MRTI in this Agreement or otherwise in writing.

**9.03    Discontinuance of Use of Marks.** MRTI may at any time require Franchisee to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks or service marks, and Franchisee agrees to comply with MRTI's directions within a reasonable time after notice. MRTI will have no liability or obligation whatsoever with respect to any such required modification or discontinuance of any Mark or the promotion of a substitute or additional trademark or service mark.

**9.04    Notification of Infringements and Claims.** Franchisee agrees to notify MRTI immediately of any apparent or threatened infringement of or challenge to Franchisee's use of any Mark, or any claim by another person of any rights in any Mark. Franchisee may not communicate with any person (other than MRTI, MRTI's Affiliate and its counsel and Franchisee's counsel) in connection with any such infringement, threat, challenge or claim. MRTI's Affiliate will have sole discretion to take such action as it deems appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, threat, challenge or claim or otherwise relating to any Mark. Franchisee agrees to sign any and all documents, render such assistance and do such things as may be advisable in the opinion of legal counsel for MRTI's Affiliate to protect the interests of MRTI's Affiliate in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect its interests in the Marks.

**9.05    Indemnification of Franchisee.** MRTI agrees to indemnify Franchisee against all damages for which it is held liable in any proceeding arising out of its authorized use of any Mark pursuant to and in compliance with the Transaction Documents and, except as provided herein, for all costs Franchisee reasonably incurs in defending any such claim brought against it, provided Franchisee has timely notified MRTI of such claim and provided further that Franchisee and its Owners and Affiliates are in compliance with the Transaction Documents entered into with MRTI or any of its Affiliates. MRTI's Affiliate, at its sole discretion, is entitled to prosecute, defend and/or settle any proceeding arising out of Franchisee's use of any Mark pursuant to this Agreement, and, if MRTI's Affiliate undertakes to prosecute, defend and/or settle any such matter, MRTI has no obligation to indemnify or reimburse Franchisee for any fees or disbursements of any legal counsel retained by Franchisee.

## 10.    RESTRICTIVE COVENANTS.

**10.01    Confidential Information.** MRTI will disclose parts of the Confidential Information to Franchisee solely for Franchisee's use in the operation of the Shop. During the Term and, (a) for a period of seven years thereafter with respect to Confidential Information, or (b) at any time subsequent thereto with respect to Confidential Information that constitutes trade secrets: (i) Franchisee may not use the Confidential Information in any other business or capacity (Franchisee acknowledges such use is an unfair method of competition); (ii) Franchisee agrees to exert its best efforts to maintain the confidentiality of the Confidential Information; (iii)

Franchisee may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (iv) Franchisee agrees to inform all employees of the need to maintain the confidentiality of the Confidential Information and shall implement all reasonable procedures MRTI prescribes to prevent unauthorized use or disclosure of the Confidential Information, including obtaining nondisclosure agreements from Franchisee's Owners, officers, directors, managers and others who attend MRTI's training programs and furnishing such agreements to MRTI.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, FRANCHISEE SHALL NOT, UNDER ANY CIRCUMSTANCES SEEK TO DETERMINE, AND SHALL NOT PERMIT ANY OTHER PERSON OR ENTITY UNDER ANY CIRCUMSTANCES TO SEEK TO DETERMINE, THE COMPOSITION OF MICHELIN RUBBER OR MRTI RUBBER PRODUCTS, AND FRANCHISEE AGREES TO BE FULLY LIABLE FOR ALL ACTUAL AND CONSEQUENTIAL DAMAGES, AND APPROPRIATE PUNITIVE DAMAGES, FOR ANY BREACH OF THIS OBLIGATION.

Franchisee's restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the tire retreading business (other than through Franchisee's own disclosure), provided Franchisee obtains MRTI's prior written consent to such disclosure or use.

**10.02  In-Term Covenants.**  During the Term, Franchisee may not, without MRTI's prior consent directly or indirectly: (a) own any legal or beneficial interest in, or render services or give advice to, any Competitive Business located anywhere or any entity located anywhere which grants franchises, licenses or other interests to others to operate any Competitive Business; or (b) divert or attempt to divert any business of any Michelin Retread Shop to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the MRTI System.  Franchisee agrees to exert its best efforts to aggressively market and sell tires retreaded using the MRTI Process authorized hereunder, and to capitalize on the full potential of the Shop.

**10.03  Exception Regarding Performance of Competitive Services.**  Notwithstanding anything in Section 10.02 to the contrary, Franchisee may:

(a)    perform certain services on competitive retread products for national fleet accounts (that is, accounts for whom the terms and conditions of supply agreements are negotiated between the competitive retread manufacturer and/or new tire manufacturer and the end user) at fleet accounts' terminals, shared fleet terminals, truck stops, trucking service centers and/or similar types of trucking servicing locations (delivered to those locations by the competitive retread manufacturer, the competitive retread manufacturer's franchisees or its agents).  Such services include mounting and dismounting products, removal/installation of tire wheel assemblies, balancing, air pressure maintenance, rotation, and fleet inspections.  Fleet terminals or other sites as referenced above may not be created to undermine the intent of this provision; and

(b)    perform certain services on competitive retread products for national fleet accounts at or outside the Shop, specifically: repairs that do not require the tire to go through the retread process; emergency road service; wheel refurbishing/inspection; and vehicle alignment.

**10.04  Information Exchange.** As part of the consideration for this Agreement, Franchisee agrees that all ideas, concepts, methods and techniques useful to a tire retreading business, whether or not constituting protectable intellectual property, that Franchisee creates or that are created on Franchisee's behalf, shall be promptly disclosed to MRTI and be held in confidence. If MRTI adopts any of them as part of the MRTI System, they will become the sole and exclusive property of MRTI or its Affiliate and will constitute works made-for-hire for MRTI or its Affiliate. Franchisee agrees to sign whatever assignment or other documents MRTI requests to evidence ownership by MRTI or its Affiliate or to assist MRTI in securing intellectual property rights in such ideas, concepts, techniques or materials.

## 11.    FRANCHISEE'S OWNERSHIP AND ORGANIZATION.

**11.01  Disclosure of Ownership Interests.** Franchisee and each of its Owners represent, warrant and agree that Schedule 2 is current, complete and accurate. Franchisee and each of its Owners agree that updates to Schedule 2 will be furnished promptly to MRTI, so that Schedule 2 (as so revised) is at all times current, complete and accurate. Each Owner shall sign Schedule 2, unless MRTI waives this requirement.

**11.02.  Organizational Documents.** If Franchisee is, or at any time becomes, a business corporation, partnership, limited liability company or other legal entity, Franchisee and each of its Owners do (or will), under Schedule 2, represent, warrant and agree that: (a) Franchisee is duly organized and validly existing under the laws of the state of its organization; (b) Franchisee has the authority to execute and deliver the Transaction Documents and to perform its obligations hereunder; (c) the articles of incorporation, partnership agreement, operating agreement or other organizational documents recite that the issuance, transfer or pledge of any direct or indirect legal or beneficial ownership interest is restricted by the terms of the Transaction Documents; and (d) all certificates representing direct or indirect legal or beneficial ownership interests now or hereafter issued bear a legend in conformity with applicable law reciting or referring to such restrictions.

## 12.    TRANSFER OF THE FRANCHISE.

**12.01  Transfer By Franchisee Subject To MRTI's Approval.** The rights and duties created by the Transaction Documents are personal to Franchisee or, if Franchisee is a business corporation, partnership, limited liability company or other legal entity, to Franchisee's Owners. Accordingly, neither Franchisee nor any of Franchisee's Owners may Transfer the Franchise without MRTI's prior written approval and without complying with all of the provisions of Section 12. Any transfer without such approval or compliance constitutes a breach of this Agreement and is void and of no force or effect.

MRTI's approval of a Transfer of the Franchise does not constitute: (a) a representation as to the fairness of the terms of any agreement or arrangement between Franchisee or

Franchisee's Owners and the transferee or as to the prospects of success of the Shop by the transferee; (b) a release of Franchisee or Franchisee's Owners, a waiver of any claims against Franchisee or Franchisee's Owners or a waiver of MRTI's right to demand the transferee's exact compliance with the Transaction Documents; or (c) a release of Franchisee from the provisions of the Transaction Documents, including the restrictive covenants set forth in Section 10. Any approval shall apply only to the specific Transfer of the Franchise being proposed and shall not constitute an approval of, or have any bearing on, any other Transfer of the Franchise.

**12.02  Conditions for MRTI's Approval.** If MRTI has not exercised its right of first refusal under Section 12.04, MRTI will not unreasonably withhold its approval of a Transfer of the Franchise that meets all of the reasonable restrictions, requirements and conditions MRTI imposes on the transfer, the transferor(s) and/or the transferee(s), including the following:

(a)    Franchisee and its Owners and Affiliates, as applicable, shall be in compliance with this Agreement and all other agreements with MRTI or any of its Affiliates and all amounts owed by Franchisee and its Owners and Affiliates to MRTI or any of its Affiliates, whether or not then payable or past due, shall be paid in full;

(b)    the proposed transferee, or its owners (if the proposed transferee is a legal entity), shall provide MRTI on a timely basis all information MRTI requests, and shall be individuals who are of good character and reputation, who have sufficient business experience, aptitude and financial resources to operate the Shop, and who otherwise meet MRTI's approval;

(c)    the transferee shall agree to upgrade the Shop and the MRTI Equipment to conform to MRTI's then current requirements for a Michelin Retread Shop and to enroll in MRTI's training program and obtain proper certification for at least one manager and all key production personnel;

(d)    the transferee (and its owners) shall agree to be bound by all of the provisions of the Transaction Documents, including the restrictive covenants set forth in Section 10, for the remainder of the Term or, at MRTI's option, execute MRTI's then current standard form of franchise agreement and related documents used in the state in which the Shop is located at the time of MRTI's approval (provided that it shall include a term equal to the remaining balance of the Term);

(e)    Franchisee or the transferee shall pay MRTI's then current standard assignment fee to defray MRTI's expenses incurred in connection with the assignment, including training of the assignee(s) and its personnel, legal and accounting fees, credit and other investigation charges and evaluation of the transferee(s) and the terms of the assignment;

(f)    Franchisee and its Owners and Affiliates shall, except to the extent limited or prohibited by applicable law, execute a general release, in form and substance satisfactory to MRTI, of any and all claims against MRTI, its Affiliates and their respective stockholders, officers, directors, employees, agents, successors and assigns;

(g)     MRTI may require that the terms of the proposed Transfer of the Franchise do not place an unreasonable financial or operational burden on the transferee, as determined by MRTI in its Reasonable Business Judgment;

(h)     any financing which Franchisee (or any of Franchisee's Owners or Affiliates) may offer the transferee shall be subordinate to any current or future obligations of the transferee to MRTI or its Affiliates;

(i)     Franchisee and Franchisee's Owners shall execute a noncompetition covenant, in form and substance satisfactory to MRTI, in favor of MRTI and the transferee agreeing, for a period of two years (or such time as remains in the term of this Agreement, if less than two years), starting on the effective date of the transfer, that Franchisee and Franchisee's Owners will not directly or indirectly own any legal or beneficial interest in, or render services or give advice to, any Competitive Business that is located or operating within a radius of 200 miles from the Shop; and

(j)     Franchisee and Franchisee's Owners and Affiliates shall execute such other documents and do such other things as MRTI may reasonably require to protect MRTI's rights under the Transaction Documents.

**12.03   Disability or Death of Controlling Owner of Franchise.**  Upon the permanent disability or death of an Owner of a controlling interest in Franchisee (as determined by MRTI in its Reasonable Business Judgment), the executor, administrator or other personal representative of such person shall transfer his or her interest in Franchisee to a third party approved by MRTI in accordance with all of the applicable provisions of Section 12 within a reasonable period of time, not to exceed nine (9) months from the date of permanent disability or death.

**12.04   MRTI's Right of First Refusal.**  If Franchisee or any of its Owners desires to make a Transfer of the Franchise, Franchisee or such Owner shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall deliver immediately to MRTI a complete and accurate copy of such offer. If the offeror proposes to buy any other property or rights from Franchisee or any of its Owners or Affiliates (other than rights under the Transaction Documents or under other franchise agreements for Michelin Retread Shops) as part of the bona fide offer, the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to MRTI; and the price and terms of purchase offered to Franchisee or its Owners for the Transfer of the Franchise must reflect the bona fide price offered therefor and may not reflect any value for any other property or rights.

MRTI has the option, exercisable by written notice delivered to Franchisee within 30 days from the date of delivery of a complete and accurate copy of such offer to MRTI, to purchase such interest in the Transaction Documents, in the Franchisee, or in the Shop, for the price and on the terms and conditions contained in such offer, provided that MRTI shall have not less than 90 days from the option exercise date to consummate the transaction. In the event the consideration, terms, and/or conditions offered by a third party are such that MRTI may not reasonably be able to furnish the same consideration, terms, and/or conditions, then MRTI may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties

cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, MRTI at its own expense may designate an independent appraiser to do so and the appraiser's determination shall be binding. MRTI has the right to investigate and analyze the business, assets and liabilities and all other matters MRTI deems necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of the offer. MRTI may conduct such investigation and analysis in any manner it deems reasonably appropriate, and Franchisee and its Owners agree to cooperate fully with MRTI in connection therewith.

If MRTI exercises its option to purchase, MRTI is entitled to purchase such interest subject to all representations and warranties, closing documents and indemnities MRTI reasonably requires. If MRTI does not exercise its option to purchase, Franchisee and its Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to MRTI's approval of the transfer as provided in Sections 12.01 and 12.02, provided that if the sale to such offeror is not completed within 90 days after delivery of such offer to MRTI, or if there is a material change in the terms of the offer, Franchisee must promptly notify MRTI, and MRTI will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30 day period following Franchisee's notification of the expiration of the 90 day period or the material change to the terms of the offer.

    12.05  **Franchisee Bankruptcy.** If Franchisee files or becomes the subject of a petition for relief under Title 11 of the United States Code or under any successor or similar federal or state bankruptcy, insolvency or receivership statute (hereafter referred to as "Franchisee's Bankruptcy"), and, for any reason, this Agreement is not terminated pursuant to Section 13, then Franchisee shall immediately inform MRTI of Franchisee's Bankruptcy and disclose the specific court in which such action is pending.

    In the event of Franchisee's Bankruptcy, Franchisee acknowledges that Franchisee's accounts receivable are part of the PMSI Collateral and, as such may not be used by Franchisee without the express consent of MRTI and its Affiliates or court approval. Franchisee acknowledges that, in order to adequately protect the interests of MRTI and its Affiliates in the PMSI Collateral, it would be necessary that: (a) Franchisee continue timely performance of all monetary and non-monetary obligations to MRTI and its Affiliates; (b) Franchisee grant to MRTI and its Affiliates replacement liens on new or additional PMSI Collateral, in addition to and not in substitution for the liens of MRTI and its Affiliates on the PMSI Collateral immediately prior to Franchisee's Bankruptcy; and (c) MRTI and its Affiliates be granted administrative expense priority claims equal to the amount of any decrease in the value of the PMSI Collateral following Franchisee's Bankruptcy.

    Franchisee acknowledges that this Agreement is an executory contract. In the event of Franchisee's Bankruptcy, promptly upon written demand by MRTI, but in no event more than 30 days following such demand, Franchisee shall decide whether to assume or reject this Agreement as an executory contract, shall advise MRTI of Franchisee's decision, shall advise MRTI of the manner in which Franchisee proposes to provide MRTI with adequate assurances of future performance, and shall diligently pursue any required approvals.

In the event of Franchisee's Bankruptcy, if Franchisee wishes to assign this Agreement to any person or entity who has made a bona fide offer to accept an assignment of this Agreement, then written notice of such proposed assignment, setting forth the name and address of the proposed assignee and all of the terms and conditions of the proposed assignment, shall be given to MRTI within 20 days after receipt of such proposed assignee's offer to accept the assignment of this Agreement, and, in any event, within 10 days prior to the date that the application is made to a court of competent jurisdiction for authority and approval to enter into such assignment. MRTI shall thereupon have a right of first refusal on the terms and conditions set forth in Section 12.04, except that MRTI shall deliver notice to Franchisee of the exercise of its right of first refusal prior to the effective date of the proposed assignment.

**12.06   Transfer by MRTI.**  MRTI has the right to transfer or assign all or any part of MRTI's rights or obligations under this Agreement or the other Transaction Documents to any person or legal entity.  If the assignee shall expressly assume and agree to perform all of MRTI's obligations under this Agreement or the other Transaction Documents accruing after the date of assignment, then the assignee shall become solely responsible for such obligations and the assignor shall have no liability therefor.  In addition, and without limiting the foregoing, MRTI may sell its assets; may sell its securities in a public offering or in a private placement; may merge with or acquire other corporations, or be acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## 13.    TERMINATION OF AGREEMENT.

**13.01   Immediate Termination.**  Franchisee will be in material breach of this Agreement, and this Agreement will automatically terminate without notice:  if Franchisee becomes insolvent by reason of its inability to pay its debts as they mature; if Franchisee is adjudicated bankrupt or insolvent; if Franchisee files a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or has such a petition filed against it which is not discharged within 30 days; if a receiver or other permanent or temporary, custodian, is appointed for Franchisee's business, assets or property; or if Franchisee requests the appointment of a receiver or makes a general assignment for the benefit of creditors.   Franchisee will be in material breach of this Agreement and this Agreement shall terminate automatically upon notice, which MRTI may issue in its sole discretion: if final judgment against Franchisee in the amount of Fifty Thousand Dollars ($50,000) or more remains unsatisfied of record for 30 days or longer; if Franchisee's bank accounts, property or accounts receivable are attached; if execution is levied against Franchisee's business or property; if suit is filed to foreclose any lien or mortgage against any of Franchisee's assets and such suit is not dismissed within 30 days; or if Franchisee voluntarily dissolves or liquidates or has a petition for dissolution filed against it and such petition is not dismissed within 30 days.

**13.02   Termination by MRTI Upon Notice.**  In addition to MRTI's right to terminate pursuant to other provisions of this Agreement and under applicable law, MRTI has the right to terminate any or all of the Transaction Documents, effective upon delivery of notice of termination to Franchisee, if Franchisee or any of its Owners or Affiliates:

(a)    abandons or fails to actively operate the Shop for thirty consecutive calendar days;

(b)    attempts to remove, sell, transfer, lease, encumber or part with possession of the MRTI Equipment or any part thereof;

(c)    makes any material misstatement or omission in the application for the rights granted hereunder or in any other information provided to MRTI;

(d)    suffers cancellation or termination of the lease for the Shop;

(e)    is convicted of, or pleads no contest to, a felony or other crime or offense that MRTI reasonably believes may adversely affect the goodwill or image associated with the Marks (including such a conviction or plea by an officer of Franchisee or any of its Owners or Affiliates);

(f)    makes an unauthorized Transfer of the Franchise or fails to Transfer the Franchise, or the interest of a deceased or disabled controlling Owner of Franchisee, as provided in Section 12.03;

(g)    makes any unauthorized use or disclosure of any Confidential Information, including inadequate control or protection of uncured Michelin Rubber, or uses, duplicates or discloses any portion of the Operating Manual in violation of the Transaction Documents;

(h)    fails to timely pay royalty fees, amounts due for MRTI Rubber Products, or any other payments due to MRTI or any of its Affiliates, and does not correct such failure within ten days after written notice of such failure is delivered to Franchisee;

(i)    fails to comply with any other provision of the Transaction Documents, any mandatory specification, standard or operating procedure prescribed by MRTI or any other agreement with MRTI or any of its Affiliates and does not correct such failure within 30 days after notice of such failure to comply is delivered to Franchisee;

(j)    fails on three or more separate occasions within any period of 12 consecutive months to comply with any one or more provisions of this Agreement or any mandatory specification, standard or operating procedure prescribed by MRTI, whether or not such failure is corrected after notice is delivered to Franchisee; or

(k)    defaults in any of the Transaction Documents or other agreement with MRTI or its Affiliates which is not cured in accordance with the terms of any such agreement.

**13.03    Termination by Franchisee Upon Notice.**  Notwithstanding anything in Section 2.01 to the contrary, and subject to the provisions of Section 14, Franchisee may terminate the Franchise Agreement at any time after three years after the Opening Date, by giving MRTI at least three months prior written notice.  MRTI shall provide a reasonable period of not less than 90 nor more than 180 days after Franchisee's notice of termination for Franchisee to transition to

a competitive retreading process, provided that the termination notice provides for the Franchise Agreement to terminate on the last day of the transition period.

## 14.   EFFECT OF TERMINATION OR EXPIRATION.

**14.01   Payment of Amounts Owed to MRTI.**  Within 30 days after the effective date of termination of this Agreement, Franchisee agrees to pay MRTI all amounts owed for MRTI Rubber Products, royalty fees, interest due on any of the foregoing and all other amounts owed to MRTI or its Affiliates which are then unpaid, including damages caused by Franchisee's breach of this Agreement, even if MRTI elects to terminate this Agreement as a result of such breach.

**14.02   Discontinue Use of Marks and MRTI System.**  Upon the termination or expiration of this Agreement, Franchisee shall:

(a)     immediately cease identifying Franchisee as an MRTI franchisee, or suggesting any connection or relationship between Franchisee and MRTI, and if requested by MRTI, shall make any corrective actions and/or advertising to inform the public that the franchise relationship has ceased;

(b)     not directly or indirectly at any time or in any manner use any Mark or any colorable imitation or other indicia of a Michelin Retread Shop;

(c)     take such action as may be required to cancel all fictitious or assumed name registrations relating to Franchisee's use of any Mark;

(d)     notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use the Marks in connection with any of Franchisee's telephone numbers, and remove all Marks and other indicia that Franchisee operates a MRTI Retread Shop from any and all  regular, classified or other telephone directory listings;

(e)     immediately cease using, and cease making any representation of  using, the MRTI Process and the MRTI System;

(f)     immediately cease using and return to MRTI any licensed software, and, in the event MRTI exercises its purchase option in the MRTI Equipment, follow the procedure set forth in paragraph 6 of the MRTI Equipment Purchase Rider;

(g)     promptly return to MRTI all signs, marketing and advertising materials, and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with Michelin Retread Shops;

(h)     immediately cease to use all Confidential Information and return to MRTI all copies of the Operating Manual and any other  materials which have been loaned to Franchisee or prepared pursuant to the Transaction Documents that are not expressly deemed by MRTI to be public, non-confidential information;

  (i)  immediately cease to use all computer hardware and software leased and/or licensed by MRTI or any of its Affiliates and comply with Franchisee's obligations under applicable lease and license agreements and delete all MRTI Confidential Information in electronic form;

  (j)  promptly, upon MRTI's request, sell (free and clear of any and all liens, encumbrances, liabilities and restrictions whatsoever) to MRTI at Franchisee's cost, less 10% for shipping and handling, all inventories of usable MRTI Rubber Products located at the Shop, including all inventories of unused Michelin Rubber, whether cured or uncured. MRTI shall have the right to set off against and reduce the purchase price by any and all amounts owed by Franchisee or any of its Owners or Affiliates to MRTI and its Affiliates, except for obligations secured by the PMSI Collateral. Franchisee shall promptly destroy any remaining inventory of MRTI Rubber Products; and

  (k)  within 30 days after the effective date of termination or expiration, furnish evidence satisfactory to MRTI of Franchisee's compliance with the foregoing obligations.

  **14.03 Continuing Obligations.** All obligations under this Agreement which expressly or by their nature survive its expiration or termination shall continue in full force and effect until they are satisfied in full or by their nature expire.

## 15. RELATIONSHIP OF THE PARTIES.

  **15.01 Independent Contractors.** MRTI and Franchisee, as between themselves, are and shall be independent contractors. Neither the Transaction Documents nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence. Nothing contained in the Transaction Documents, or arising from the conduct of the parties thereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. Franchisee agrees to conspicuously identify itself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of the Shop. Franchisee agrees to place such other notices of independent ownership on purchase orders, business cards, stationery, marketing and advertising materials and other materials as MRTI may require from time to time.

  Franchisee may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in MRTI's name or on MRTI's behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. MRTI will not be obligated by or have any liability under any agreements made by Franchisee with any third party or for any representations made by Franchisee to any third party. Franchisee shall not obligate MRTI for any damages or liabilities to any person or property arising directly or indirectly out of the operation of Franchisee's business hereunder.

  **15.02 Indemnification.** Franchisee agrees to indemnify and hold harmless to the fullest extent permitted by law, MRTI, its Affiliates and their respective directors, officers, employees, shareholders, agents, successors and assigns (collectively "Indemnitees") from any and all losses and expenses (as hereinafter defined) incurred in connection with any litigation or other form of

*N. G*

adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, as a result of, or in connection with Franchisee's development or operation of the Shop, performance or nonperformance of this Agreement or the sale of any retreaded tire (collectively "event"), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the Indemnitees, including any product liability, failure to warn or warranty claims relating to tires retreaded by Franchisee using the MRTI Process, or any claims relating to the delivery and installation of the MRTI Equipment or the operation, use, maintenance or repair of MRTI Equipment, provided, however, that this indemnity shall not apply to any liability arising from the gross negligence or willful acts of Indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein shall extend to any finding of comparative or contributory negligence attributable to Franchisee). The term "losses and expenses" shall be deemed to include compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to MRTI's reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses. Franchisee agrees to give MRTI prompt notice of any event of which Franchisee is aware for which indemnification is required, and, at Franchisee's expense and risk, MRTI may elect to assume (but under no circumstances is obligated to undertake) the defense and/or efforts to effect settlement thereof. MRTI's assumption of the defense or settlement efforts does not modify Franchisee's indemnification obligation. MRTI may, in its sole judgment, take such action as it deems necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereto as may be, in MRTI's sole judgment, necessary for the protection of the Indemnitees or Michelin Retread Shops generally. This Section shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

   **15.03  Taxes.** Franchisee agrees to promptly pay to MRTI and its Affiliates an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by MRTI or any of its Affiliates by reason of the furnishing of products, intangible property (including trademarks), equipment or services to Franchisee. Franchisee agrees to fully cooperate in connection with any filings of required tax returns and reports by MRTI or its Affiliate concerning the MRTI Equipment and to fully cooperate in connection with any tax audits. In the event of a bona fide dispute as to Franchisee's liability for taxes, Franchisee may contest its liability in accordance with applicable law. In no event, however, will Franchisee permit a tax sale, seizure, or attachment to occur against the Shop, the MRTI Equipment or any of the contents or assets of the Shop.

## 16.    MISCELLANEOUS.

   **16.01  Governing Law.** This Agreement and all issues arising from or relating to this Agreement shall be governed by and construed under the laws of the State of South Carolina, without regard to the application of South Carolina conflict of law principles.

16.02  **Exclusive Jurisdiction.**  Franchisee and each of Franchisee's Owners agrees that the state or federal court of general jurisdiction in the judicial district in which MRTI has its principal place of business at the time of commencement of proceedings shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement, the Transaction Documents and any personal covenants or guarantees by Franchisee's Owners.  Franchisee and each of its Owners irrevocably submits to the jurisdiction of such courts and waives any objections to either the jurisdiction of or venue in such courts.

16.03  **Injunctive Relief.**  MRTI may seek to obtain at any time in any court of competent jurisdiction any order for specific performance or injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause MRTI irreparable harm.  MRTI may have such specific performance or injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and Franchisee's sole remedy in the event of the entry of such specific performance or injunction order, shall be the dissolution of such order, if warranted (all claims for damages by reason of the wrongful issuance of any such order being expressly waived hereby).  Franchisee and each of its Owners acknowledges that any violation of Sections 9, 10, 12 or 14.02 would result in irreparable injury to MRTI for which no adequate remedy at law may be available.  Accordingly, Franchisee and each of its Owners consents to the issuance of an injunction at MRTI's request (without posting a bond or other security) prohibiting any conduct in violation of any of those sections and agrees that the existence of any claims Franchisee or any of its Owners may have against MRTI, whether or not arising herefrom, shall not constitute a defense to the enforcement of any of those Sections.

16.04  **Costs and Attorneys' Fees.**  If MRTI or any of its affiliates claims in any judicial proceeding that Franchisee or any of its Owners owes MRTI or any of its Affiliates money or that Franchisee or any of its Owners has breached any provisions of the Transaction Documents, and MRTI or such Affiliate prevails on such claim, then MRTI or its Affiliate shall be awarded its costs and expenses incurred in connection with such proceedings, including reasonable attorneys' fees.

16.05  **Limitations on Legal Claims.**  Except with respect to Franchisee's obligations herein regarding the Confidential Information and the Marks, MRTI and Franchisee (and its Owners) each waives, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other.  Franchisee and each of its Owners waives, to the fullest extent permitted by applicable law, the right to recover consequential damages for any claim directly or indirectly arising from or relating to the Transaction Documents or the relationship between the parties.  Furthermore, the parties agree that any legal action in connection therewith shall be tried to the court sitting without a jury, and all parties waive any right to have any action tried by jury.

16.06  **Severability and Substitution of Provisions.**  Every part of this Agreement shall be considered severable.  If for any reason any part of this Agreement is held to be invalid, that determination shall not impair the other parts of this Agreement.  If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of

geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, the parties agree that it will be enforced to the fullest extent permissible under applicable law and public policy. If any applicable law requires a greater prior notice of the termination of this Agreement, a different standard of "good cause", or the taking of some other action not required hereunder, then the prior notice, "good cause" standard and/or other action required by such law shall be substituted for the comparable provisions hereof. If any provision of the Transaction Documents or any specification, standard or operating procedure prescribed by MRTI is invalid or unenforceable under applicable law, MRTI has the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

**16.07    Waiver of Obligations.** MRTI and Franchisee may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. Any waiver granted by either party shall be without prejudice to any other rights such party may have, will be subject to continuing review and may be revoked at any time and for any reason, effective upon delivery to the other party of ten days' prior written notice. MRTI and Franchisee shall not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by Franchisee or MRTI to exercise any right under this Agreement (except as provided in Section 16.08) or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by MRTI to exercise any right, whether of the same, similar or different nature, with respect to other Michelin Retread Shops; or the acceptance by MRTI of any payments due from Franchisee after any breach of any provisions in the Transaction Documents.

**16.08    Exercise of Rights.** The rights of the parties hereunder are cumulative and no exercise or enforcement by either party of any right or remedy hereunder shall preclude the exercise or enforcement by either party of any other right or remedy hereunder which that party is entitled to enforce by law. Notwithstanding the foregoing, and except as otherwise prohibited or limited by applicable law, any failure, neglect, or delay of a party to assert any breach or violation of any legal or equitable right arising from or in connection with the Transaction Documents or the relationship between the parties shall constitute a waiver of such right and shall preclude the exercise or enforcement of any legal or equitable remedy arising therefrom, unless written notice specifying such breach or violation is provided to the other party within 12 months after the later of: (a) the date of such breach or violation; or (b) the date of discovery of the facts (or the date the facts could have been discovered, using reasonable diligence) giving rise to such breach or violation.

**16.09    Construction.** This Agreement and the Transaction Documents constitute multiple parts of a single transaction and are to be construed in such fashion. The language of this Agreement and the Transaction Documents shall be construed according to its fair meaning and not strictly against any party. The introduction, personal covenants or guarantees of Owners, schedules and riders (if any) to this Agreement, as well as the Operating Manual, are a part of this Agreement, which, along with the Transaction Documents constitute the entire agreement of the parties. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this

Agreement, other than the franchise offering circular, that either party may or does rely on or that will have any force or effect. In the event of a direct conflict between the terms of this Franchise Agreement and the terms of any other Transaction Documents (excluding the Michelin Dealer Sales Agreement), the terms of this Franchise Agreement shall govern. Except as otherwise expressly provided, nothing in the Transaction Documents shall be deemed to confer any rights or remedies on any person or legal entity not a party hereto. This Agreement shall not be modified except by written agreement signed by both parties.

The headings of sections are for convenience only and do not limit or construe their contents. The word "including" (or any variation thereof) shall be construed to include the words "without limitation." The term "Franchisee" is applicable to one or more persons, a corporation, limited liability company, partnership or other legal entity, as the case may be. If two or more persons are at any time Franchisee hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to MRTI shall be joint and several.

This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. Any and all rights and obligations of MRTI under this Agreement may, at MRTI's sole discretion, be exercised or performed by any Affiliate of MRTI, provided, however, that MRTI shall be solely and exclusively responsible to Franchisee for the performance of any such obligations delegated to any Affiliate and no such Affiliate shall have any liability whatsoever to Franchisee or others, directly or indirectly, as a result of, in connection with or relating to exercising any such rights or performing any such obligations. This Agreement may be executed in multiple copies, each of which shall be deemed an original. Time is of the essence in this Agreement.

**16.10   Approvals and Consents.** Whenever this Agreement or the Transaction Documents require the approval or consent of either party, the other party shall make written request therefor, and such approval or consent shall be obtained in writing; provided however, unless specified otherwise in this Agreement or in the Transaction Documents, such party may withhold approval or consent at its sole discretion.

**16.11   Notices and Payments.** All notices, requests and reports permitted or required to be delivered by this Agreement or the Transaction Documents shall be deemed delivered:  (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) one business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) five business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement shall be sent to MRTI at the address identified in this Agreement unless and until a different address has been designated by written notice. No restrictive endorsement on any check or in any letter or other communication accompanying any payment shall bind MRTI, and MRTI's acceptance of any such payment shall not constitute an accord and satisfaction.

**16.12  Force Majeure.**  Neither MRTI, Franchisee nor their Affiliates shall be liable for any delay in the performance of its or their obligations hereunder (other than payment obligations) caused by fire, strikes, disputes, war, embargoes, acts of God, delay in transportation, inability to obtain raw materials, or any other cause beyond its or their reasonable control.

**16.13  Receipt of Offering Circular and Agreement.**  Franchisee acknowledges having received MRTI's franchise offering circular by the earliest of:  (a) the first personal meeting to discuss the franchise; (b) ten business days before signing a binding agreement; or (c) ten business days before making any payment to MRTI relating to this Agreement.  Franchisee acknowledges having received this Agreement, with all blanks completed, at least five business days before Franchisee signed it.

**16.14  Franchisee's Acknowledgments.**  Franchisee has read this Agreement and MRTI's franchise offering circular, understands the terms of this Agreement and accepts them as being reasonably necessary to maintain MRTI's image and standards and to protect the goodwill of the Marks and the integrity of the MRTI System.  Franchisee has conducted an independent investigation of the business contemplated by this Agreement and recognizes that an investment in a Michelin Retread Shop involves business risks, that the success of the venture is largely dependent on Franchisee's own business abilities, efforts and financial resources, and that the nature of Michelin Retread Shops may change over time.  Franchisee has not received or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement.

**16.15  Franchisee's Representations.**  Franchisee and its Owners represent and warrant that:  (a) neither Franchisee nor any of its Owners has made any untrue statement of any material fact or has omitted to state any material fact in obtaining the rights granted hereunder; (b) the execution and performance of this Agreement will not violate any other agreement to which Franchisee or any of its Owners may be bound.  Franchisee and its Owners recognize that MRTI has approved Franchisee's application in reliance on all of the statements Franchisee and its Owners have made in connection therewith.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed and delivered this agreement on the day and year first above written.

**MICHELIN RETREAD TECHNOLOGIES, INC., a Delaware corporation**

By: _____

Print Name: _Thomas M. Brennan_

Title: _President_

**FRANCHISEE**

_Inter-City Retread, Inc._

By: _____

Print Name: _Neil Erbesh_

Title: _President_

If Individuals:

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

<u>MRTI EQUIPMENT PURCHASE RIDER</u> - TO THAT CERTAIN MICHELIN RETREAD TECHNOLOGIES, INC. FRANCHISE AGREEMENT ENTERED INTO WITH INTER-CITY RETREAD, INC. AS OF <u>November 1</u>, 2005 ("the Franchise Agreement").

1.    Notwithstanding anything to the contrary contained in the Franchise Agreement, MRTI agrees to sell, and Franchisee agrees to purchase, the MRTI Equipment specified and described in Exhibit A (the "Purchased Equipment") in accordance with the terms and conditions, including purchase price, payment and shipping terms, specified in Exhibit B ("Bill of Sale").

2.    MRTI shall deliver and install, or cause to be delivered and installed, the Purchased Equipment at the Shop on such time schedule(s) as MRTI deems reasonably appropriate; provided MRTI shall exert reasonable efforts to complete delivery and installation of the Purchased Equipment within a reasonable period of time before the opening of the Shop.  Notwithstanding the foregoing, Franchisee acknowledges and agrees that MRTI shall not be liable for any delay in the delivery and installation of the Purchased Equipment caused by fire, strikes, disputes, war, embargoes, acts of God, delays in transportation, any failure by Franchisee or any other cause beyond MRTI's reasonable control.  Franchisee agrees to provide all assistance requested by MRTI and its agents in connection with delivery and installation of the Purchased Equipment.

3.    MRTI IS NOT THE MANUFACTURER OF THE PURCHASED EQUIPMENT, NOR THE MANUFACTURER'S AGENT.  MRTI ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES HEREBY EXPRESSLY DISCLAIMS ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED EQUIPMENT, INCLUDING THE MERCHANTABILITY OF THE PURCHASED EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE; THE DESIGN OR CONDITION OF THE PURCHASED EQUIPMENT; THE QUALITY OR CAPACITY OF THE PURCHASED EQUIPMENT; THE WORKMANSHIP IN THE PURCHASED EQUIPMENT; COMPLIANCE OF THE PURCHASED EQUIPMENT WITH THE REQUIREMENTS OF ANY LAW, RULE, OR SPECIFICATION; OR WARRANTY AGAINST PATENT INFRINGEMENT, COPYRIGHT INFRINGEMENT, OR LATENT DEFECT.  All such risks, as between MRTI and Franchisee, are to be borne by Franchisee.  Franchisee agrees that MRTI provides the Purchased Equipment "as is."  MRTI agrees to pass through any manufacturers' warranties to Franchisee, to the extent permitted to do so by the manufacturer.  Neither MRTI nor any of its Affiliates is responsible or liable for any direct, indirect, actual, incidental or consequential damages or losses resulting from or relating to the delivery, installation, acceptance, rejection, possession, operation, use, availability of parts, maintenance, repair, condition or return of the Purchased Equipment.

4.    Franchisee agrees to use, operate and maintain the Purchased Equipment in a careful and proper manner in compliance with all applicable laws and regulations, all

A-11

manufacturer's guidelines and all specifications, standards and operating procedures prescribed by MRTI.

5.      Franchisee agrees to undertake all required inspections of the Purchased Equipment and, to the extent required by applicable law, post appropriate certificates of inspection or other evidence of approval.  Franchisee further agrees:  (a) to maintain and/or install such safety features on the Purchased Equipment as are originally installed or are thereafter recommended by MRTI and in conformity with all applicable safety codes and regulations; and (b) not to alter any safety features on the Purchased Equipment.

6.      Upon termination or expiration of this Franchise Agreement or of any renewal Franchise Agreement, MRTI shall have the option, exercisable by written notice within sixty (60) days following such termination or expiration, to repurchase any or all of the Purchased Equipment at the same price paid therefor by Franchisee, depreciated up to the date of repurchase on a straight line basis, assuming an asset life of ten (10) years commencing from the initial date of installation.  In the event any piece of Purchased Equipment has been installed for nine (9) years or longer, MRTI's repurchase price for that piece shall be ten percent (10%) of Franchisee's initial purchase price.  Any amounts owed to MRTI or its affiliates by Franchisee shall be subtracted from said repurchase price.  In the event that MRTI exercises this option to repurchase any or all of the Purchased Equipment, Franchisee must deliver the Purchased Equipment to such address as MRTI may designate, free and clear of all liens and encumbrances and in good operating condition.  Franchisee shall be solely responsible for all costs, risks of loss and liability in connection with the removal and shipment of the Purchased Equipment.

7.      During the Term of the Franchise Agreement, Franchisee shall not sell, lease or in any other way transfer title or possession of any Purchased Equipment to third parties without first offering in writing such Purchased Equipment for purchase by MRTI at fair market value, free and clear of all liens and encumbrances and in good operating condition.  For purposes of this Section 7, "fair market value" shall mean the value mutually established by the Franchisee and MRTI or as determined by an equipment broker mutually selected by Franchisee and MRTI.

INTER-CITY RETREAD, INC.,
a New Jersey corporation

By: _____

Print Name: Neil Erbesh
Title: President

MICHELIN RETREAD TECHNOLOGIES,
INC., a Delaware corporation

By: _____

Print Name: Thomas M. Brennan
Title: President

A-12

**Exhibit A**
**to MRTI Equipment Purchase Rider**

**Purchased Equipment**


MRTI EQUIPMENT LIST

    2 NDTs (Nail Detector Testing Machines)
    1 X Ray Post (Imaging Machine and Spreader)
    2  Single-Head Buffers
    1 CIA (Casing Integrity Analyzer Shearography Machine) *1
    5 Skiving & Filling Posts
    8 Repair Posts (1 table and 2 spreaders per post)
    1 Cement Booth
    2 Pre-Mold Builders, with Temperature Control Units and Chillers and Extruders
    2 Enveloping / De-enveloping Posts
    1 Tilt Table
    2 Curing Chambers (25 Tires)
    2 Final Inspection Posts
    1 Wide Casing Implementation Package
    All necessary Monorail and components, including J-Hooks and Trollies and lifts
    and tilt tables as needed.
    *2

**Note 1**:  The analytical software for the CIA is excluded from the sale and is covered by a Software License.

**Note 2**:  Ancillary and consumable items not included and to be billed separately.

May 2003

*N. E.*

**Exhibit B**
**to MRTI Equipment Purchase Rider**

**BILL OF SALE**

This Bill of Sale is entered into as of the ___1st___ day of _November_ , 2005 between Michelin Retread Technologies, Inc., a Delaware corporation, having a place of business at 632 Inglesby Parkway, Duncan, South Carolina 29334 ("MRTI"), and Inter-City Retread, Inc., a New Jersey corporation, having a place of business at 777 Dowd Avenue, Elizabeth, New Jersey 07201 ("Franchisee").

This Bill of Sale is issued pursuant to the MRTI Equipment Purchase Rider to that certain Michelin Retread Technologies, Inc. Franchise Agreement entered into by MRTI and Franchisee as of _November 1_ , 2005 ("Equipment Purchase Rider").

For and in consideration of the sum of Eight Hundred Twenty Six Thousand Three Hundred Eighty One and 00/100 dollars ($826,381), the sufficiency of which is hereby acknowledged by the parties, MRTI hereby sells and transfers to Franchisee the MRTI Equipment as more particularly described in Exhibit A, attached hereto and incorporated herein by reference. This sale is subject to the terms and conditions of the MRTI Equipment Purchase Rider. The sum stated herein does not include any taxes. Any and all taxes related to such sale, including sales tax, shall be the responsibility of Franchisee. Sales tax shall be included in the invoice issued by MRTI to Franchisee in connection with the sale.

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be executed as of the day and year first written above.

**INTER-CITY RETREAD, INC.**
a New Jersey corporation

By: _____
Print Name: Neil Erbesh
Title: President

**MICHELIN RETREAD TECHNOLOGIES,**
**INC.,** a Delaware corporation

By: _____
Print Name: Thomas M. Brennan
Title: President



November 1_____, 2005

Mr. Neil Erbesh
Inter-City Retread, Inc.
777 Dowd Avenue
Elizabeth, New Jersey  07201

Re:  Inter-City Retread, Inc. ("Inter-City")

Dear Neil:

This letter is issued in connection with the Franchise Agreement of even date herewith between Inter-City and Michelin Retread Technologies, Inc. ("MRTI"), referred to herein as the "Franchise Agreement".

Please refer to the MRTI Equipment Purchase Rider, which is found in the Appendices to the Franchise Agreement at pages A-11 and A-12 (the "Equipment Purchase Rider").  The second sentence of Section 6 of the Equipment Purchase Rider states that "In the event any piece of Purchased Equipment has been installed for nine (9) years or longer, MRTI's repurchase price for that piece shall be ten percent (10%) of Franchisee's initial purchase price."  _

The parties hereby confirm their agreement that with regard to the MRTI Equipment which was installed on or before the January 5, 2000 Shop Opening Date, the term "initial purchase price" shall refer to that portion of the aggregate Official Turn-Key Value of Installed MRTI Retread Plant set forth in Jim Hay's May 3, 2000 letter to you which is attributable to the particular piece of MRTI Equipment for which MRTI wishes to exercise its repurchase option.

Please acknowledge your agreement by signing in the space provided below.

Sincerely,

Michelin Retread Technologies, Inc.

By: _____
Its: _President_____

ACKNOWLEDGED AND ACCEPTED:

Inter-City Retread, Inc.

By: _____
Its: _President_____
Date: _10/31/05_____

One Parkway South
P.O. Box 19001
Greenville, South Carolina 29602-9001
Tel: 864 / 458-5000 Main Number
        864 / 458-5954 Tom Brennan Direct



**Michelin Retread Technologies, Inc.**
632 Inglesby Parkway, Duncan, SC 29334-9607
Tel: 864-627-5631 • Fax: 864-627-5622

May 3, 2000

Mr. Neal Erbesh
Inter-City Retread, Inc.
777 Dowd Avenue
Elizabeth, NJ 07201

**Re: Official Turn-Key Value of Installed MRTI Retread Plant**

Dear Morris:

Listed below is the firm fixed value of the turn-key MRTI retread system installed at your
MRTI location. All figures exclude building modifications, boilers, air compressors, and
other items of dealer responsibility.

**OFFICIAL TURN-KEY VALUE OF INSTALLED MRTI RETREAD PLANT***

|  | Shop Value Excluding Proprietary Items | MRTI Proprietary Items C.I.A., X-Ray | Total Shop Value Including Proprietary Items |
|---|---|---|---|
| Elizabeth shop | $1,417,985 | $234,777 | $1,652,762 |

*Assumes no equipment configuration change during the first five years of the franchise.

The first column on the chart, *Shop Value Excluding Proprietary Items,* is the current
value of the equipment which you may ultimately purchase, should you choose during the
second five years of the franchise to exercise the Option to Purchase. This value excludes
the non-purchasable equipment, which is under the heading *MRTI Proprietary Items.* All
non-purchasable items must be leased during the second five years of the franchise. Rental
of the CIA machine and the x-ray machine would be charged at the then current rental
rate.

Mr. Neal Erbesh                    Page 2                      May 3, 2000

All values listed in the above chart assume no change in equipment configuration during the first five years of the franchise. Of course, any additions, deletions or substitutions of equipment may alter the value of the shop, in which case, you will receive another letter from me, informing you of the revised value.

In the event you choose not to exercise the Option to Purchase, and prefer to lease the MRTI retread system during the second five years of the franchise, Exhibit A of the Equipment Lease (a copy of a customized Exhibit A is attached as an illustration for your reference) provides that the *Shop Value Excluding Proprietary Items* set forth above would be used to calculate the lease cost of the purchasable items during the renewal term. Rental of the CIA machine and the x-ray machine would be charged at the then current rental rate.

The figure in the *Total Shop Value Including Proprietary Items* is the value of all MRTI equipment at your shop. You may inform your insurance company of this total value when you arrange insurance coverage for your shop.

Please be advised that no other individual is authorized to provide an adjustment or variation to this official value notification. I hope that this letter has answered your questions about shop value.

Sincerely,

Jim Hay
President

Attachment – Exhibit A

I:\EXCEL\franchis\DEPR_6.XLS]PreMold Lease Renewal

5-Feb-00 Rev. 3

## Exhibit "A"

FOR ILLUSTRATION PURPOSE ONLY

### Estimated Pre-Mold Shop Equipment Lease During the Renewal Period

1 **Shop equipment will be leased at the beginning of year six based on the then current value financed at Prime to Prime plus 3 points for five years (see Note 2 and 3).**

2 **The lease cost will be fixed during the five year renewal period for the original complement of leased equipment.**

3 **The lease cost would be adjusted for equipment added during the renewal period, at the request of the franchisee, for purposes of increasing capacity (such as a chamber) and \ or flexibility (such as a buffer).**

**Inter City Tire**
**Elizabeth, NJ**

| | Example: | ($ 000) Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PreMold Equip: | $ 1,418 (4) | | $ 1,276 | $ 1,134 | $ 993 | $ 851 | $ 709 | | | | | | |
| Addition: | | | | | | | | | | | | | |
| Chamber | begin yr 5 $ 60 | | | | | | $ 54 | | | | | | |
| Substitution: | | | | | | | | | | | | | |
| Buffer 1 Head | begin yr 4 $ (130) | | | | | $ (78) | $ (65) | | | | | | |
| Buffer 2 Head | begin yr 4 $ 180 | | | | | $ 162 | $ 144 | | | | | | |
| Net Value | | | $ 1,276 | $ 1,134 | $ 993 | $ 935 | $ 842 | | | | | | |
| **Annual Lease Cost Determination:** | | | | | | | | | | | | | |
| Base Lease | | | $ 0.001 | $ 0.001 | $ 0.001 | $ 0.001 | $ 0.001 | | | | | | |
| Beginning value | $ 842.0 | | | | | | | $ 207.3 | $ 207.3 | $ 207.3 | $ 207.3 | $ 207.3 | |
| Addition: | | | | | | | | | | | | | |
| Chamber | begin yr 8 $ 100 | | | | | | | | | $ 14.9 | $ 14.9 | $ 14.9 | (6) |
| Substitution: | | | | | | | | | | | | | |
| PMTreadBuilder | begin yr 9 $ (150) | | | | | | | | | | $ - | $ - | (5) |
| PMTreadBuilder II | begin yr 9 $ 180 | | | | | | | | | | $ 26.8 | $ 26.8 | (6) |
| Subtotal before taxes, insurance and \ or fees | | | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 207.3 | $ 207.3 | $ 222.2 | $ 249.0 | $ 249.0 | |
| Taxes, Insurance and \ or Fees (1) | | 10% | $ 21.1 | $ 21.1 | $ 21.1 | $ 21.1 | $ 21.1 | $ 20.7 | $ 20.7 | $ 22.2 | $ 24.9 | $ 24.9 | |
| Total after taxes, insurance and\or fees | | | $ 21.1 | $ 21.1 | $ 21.1 | $ 21.1 | $ 21.1 | $ 228.0 | $ 228.0 | $ 244.4 | $ 273.9 | $ 273.9 | |

Notes: (1): Estimated at 10% of lease financial value...Franchisee responsible for any local/state taxes, insurance and/or fees associated with equipment. Amount would change as shop equipment value, tax rates, insurance coverage, and fees change over time... (2): Assumed financing at 8.5%... (3): Plus any taxes, insurance, and/or fees... (4) Total shop value less C.t.A.+ X-ray...(5): Can only be substituted with MRTI consent, no resale value...(6) Financed 10 years, 8.5%

MAY 25 2000 11:58 AM FR MICHELIN 8642875615 TO 919083541714 P.04



# MICHELIN

Michelin North America, Inc.
692 Inglesby Parkway, Duncan, SC 29334-9954
Tel: 864-433-1603 * Fax: 864-627-5615

# TELEFAX

Date: 5/25/00

To: Morris Erbesh          Dept:

Firm/Location: Inter City

Telecopier Number: (908) 354-1714

From: Pam Jamarik          Dept: MRT

Phone Number: (864) 627-5713

Telecopier Number: (864) 627-5615

Total Number of Pages: 4     (including cover sheet)

Reference or Instructions: Morris — Per your request,
attached is a copy of the shop value
letter addressed to Neal.
                          Best regards,
                          Pam

**CONFIDENTIALITY NOTE:**

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this transmission is strictly prohibited. If you have received this telecopy in error, please notify us by telephone immediately and return the original transmission to us via the United States Postal Service at the address shown at the top right.

### SALES SUPPORT AGREEMENT

This **Agreement**, effective as of ___November 1___, 2005, between Michelin North America, Inc., a New York corporation ("MNA"), Michelin Retread Technologies, Inc., a Delaware corporation ("MRTI") and Inter-City Retread, Inc., a New Jersey corporation ("Franchisee"). MNA and MRTI are sometimes collectively referred to herein as ("Michelin").

W I T N E S S E T H:

**WHEREAS**, MNA, through its divisions, manufactures and distributes MNA products; and

**WHEREAS**, Franchisee has entered into an MNA Authorized Commercial Customer Agreement with Michelin Americas Truck Tires Division, as amended from time to time by MNA (including the BFGoodrich Brand Truck Tire supplemental agreement), hereinafter referred to as "Dealer Agreement" (as offered by MNA, year-to-year, consistent with past practice); and

**WHEREAS**, Franchisee is currently authorized to sell certain Michelin Products and is also engaged in the business of retreading, light truck and truck tires; and

**WHEREAS**, MRTI is engaged in the business of franchising retreading process and systems for truck tires in North America and this Agreement is issued in connection with certain Franchise Agreement(s) between MRTI and Franchisee of even date herewith; and

**WHEREAS**, the parties agree that it is in the best interests of all parties to enter into this Agreement in order to secure the continued growth of Franchisee, its sale of new Michelin products, and the growth of each party in the retread business; and

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

**Section 1.    <u>Duration.</u>**

1.1  Except as otherwise stated herein, the provisions of this Agreement shall automatically terminate upon the earlier of:  (i) termination or non-renewal of the Dealer Agreement with Michelin Americas Truck Tires Division; (ii)  termination, expiration or non-renewal of any Franchise Agreement with Franchisee; or (iii) December 31, 2008. For the avoidance of doubt, in no event will the term of this Agreement extend beyond December 31, 2008. Following the termination or expiration of this Agreement, no party shall have any obligation to any other party except to the extent that such obligation shall have accrued on or prior to such termination or expiration.

**Section 2. <u>Market Development Funds</u>.**

This Agreement will provide for the market development funds as described in this Section 2.

*/  ,*

2.1  <u>Michelin Truck Center Support Funds</u>.  The funds described in this Section 2.1 shall be referred to as ("Michelin Truck Center Support Funds").

(a)  For the years 2005, 2006 and 2007, as described in Exhibit 1 attached hereto, Michelin will provide support per qualified Michelin brand commercial truck tire unit ("Qualified Unit") sold by Franchisee to a Non-North American Fleet Account ("Non-NAFA") customer (net of returns) through Franchisee's Truck Center located at the truck center portion of Franchisee's 777 Dowd Avenue, Elizabeth, NJ facility ("Truck Center"). Tires also listed on Exhibit 1 but sold through Franchisee's other locations, including other business portions of the 777 Dowd Avenue, Elizabeth, NJ facility, are not eligible for Michelin Truck Center Support Funds.  The Michelin Truck Center Support Funds are provided solely for Qualified Units sold in Franchisee's Truck Center, and Franchisee must be in compliance with this requirement to be eligible for payment of funds hereunder.

(b)  Franchisee must purchase from MNA a minimum of (i) 10,000 Non-NAFA Michelin brand commercial truck tires ("Non-NAFA Michelin Units") per calendar year; <u>and</u> (ii) 2,500 Non-NAFA Michelin Units per quarter to qualify for payment of the Michelin Truck center Support Funds.  The Non-NAFA Michelin Units are defined on Exhibit 2 attached hereto.

(c)  The amounts described in this Section 2.1 represent funds that Michelin will commit to Franchisee as support funds to promote increased sales through Franchisee's Truck Center. The amounts earned for each of the years set forth above will be paid in the form of a quarterly lump sum credit on Franchisee's trade account with Michelin. The Michelin Truck Center Support Funds will be paid no later than February 1 following completion of the eligible year.

2.2  <u>Michelin Annual Developmental Funds</u>.  The funds described in this Section 2.2 shall be referred to as ("Michelin Annual Developmental Funds").

(a)  For the years 2005, 2006 and 2007, Michelin will provide the following assistance to Franchisee:

| | |
|---|---|
| 2005 | $145,500 |
| 2006 | $157,500 |
| 2007 | $169,500 |

(b)  These amounts represent funds that Michelin will commit to Franchisee for the promotion and expansion of Michelin brand commercial truck tire and MRT retread sales and to meet competition in Franchisee's market area.

(c)  The amounts for each of the years set forth above will be paid in the form of a lump sum credit on Franchisee's trade account with Michelin. The Michelin Annual Developmental Funds for 2005 will be paid upon execution of the Franchise Agreement between the parties, and all other Transaction Documents (as defined in the Franchise Agreement) and for

2

*N. E.*

the years 2006 and 2007 will be paid no later than November 15 of the eligible year.

2.3  __MRTI Signing Bonus.__ MRTI shall issue to Franchisee a signing bonus in the sum of Four Hundred Thousand dollars & no/100 ($400,000) in the form of a credit on Franchisee's trade account upon execution of the Franchise Agreement between the parties, and all other Transaction Documents(as defined in the Franchise Agreement) ("MRTI Signing Bonus").

2.4  __MRTI Interest Reimbursement Program__. As an additional incentive for Franchisee's MRTI renewal, MRTI will credit to Franchisee's trade account the sum of Thirty-nine Thousand Eight Hundred Thirty-Five Dollars ($39,835.00) for interest reimbursement on Franchisee's purchase of MRTI equipment ("2005 MRTI Interest Reimbursement Payment"). This sum is paid to Franchisee in lieu of any amounts which would otherwise be earned by Franchisee under the MRTI 5% Interest Reimbursement Program during the year 2005.

2.5  __MRTI Process Enhancement Fund Program.__  For funds accrued by Franchisee pursuant to the MRTI Process Enhancement Fund Program, in accordance with the then current terms and conditions of such program ("MRTI Process Enhancement Funds"), the parties agree as follows:

(a)  If the MRTI Process Enhancement Funds reach the sum of One Hundred Thousand Dollars ($100,000), MRTI agrees that it will permit funds earned by Franchisee exceeding One Hundred Thousand Dollars ($100,000) to be used for mutually agreed commercial or retread business expansion ("MRTI Process Enhancement Funds") and upon such agreement the funds will be issued in the form of a credit on Franchisee's trade account with Michelin. If at any time the initially accrued One Hundred Thousand and 00/100 ($100,000) or any portion thereof, is utilized by Franchisee for MRTI-approved equipment upgrades for its retread shop, amounts earned by Franchisee pursuant to the terms of the MRTI Process Enhancement Program will continue to accrue until the One Hundred Thousand and 00/100 ($100,000) is replenished. Until such accrual of One Hundred Thousand and 00/100 ($100,000) is replenished, no funds will be utilized for commercial or retread business expansion.

(b)  For all MRTI equipment enhancements required by MRTI, Franchisee will utilize the then current balance of its accrued MRTI Process Enhancement Funds. If the balance does not provide enough money to pay for the required enhancement, Michelin and Franchisee will come to mutually agreeable payment terms so as not to materially impact Franchisee's immediate cash flow.

2.6  __Bib Tread Assistance.__  After Franchisee's execution of MRTI's Bib Tread™ BT Mobile™ Master Software License Agreement, MRTI will pay all of the software license fees, training and installation costs required to install Franchisee's Bib Tread system™. In addition, MRTI will reimburse Franchisee for the costs of the specified equipment required to run the Bib Tread system™ , in the form of a credit to Franchisee's trade account with Michelin. This equipment will include, among other things, a terminal at each post in the Shop. For the avoidance of doubt, Franchisee will be responsible for the $275 monthly Bib Tread™ software maintenance fees. In

3

addition, MRTI will have the interface built from Franchisee's current back office ASA Tire-Pro software to BibTread™.

2.7  Purpose.  The assistance referred to in this Section 2 is being provided by Michelin to facilitate the Franchisee with the aggressive marketing of Michelin product into the Northern New Jersey and metropolitan New York market area.

## Section 3.  New Franchise.

3.1  In consideration for Franchisee's commitment to renew its franchise relationship with MRTI, MRTI agrees, that for a period of three (3) years from the date of this Agreement, that it will not award a new MRTI Pre-Mold™ franchise to any third party in the counties identified on Exhibit 3 (the "New Franchise") without first giving Franchisee an opportunity ·to accept the New Franchise.  This commitment is limited to Pre-Mold™ shops only and subject to Franchisee meeting the MRTI goals set forth on Exhibit 3. MRTI will provide Franchisee written notification of a New Franchise opportunity.  Franchisee must notify MRTI in writing of its decision to accept or reject the New Franchise opportunity within sixty (60) days after receipt of the MRTI notification. If Franchisee accepts a New Franchise opportunity, all franchise documents must be executed within sixty (60) days of Franchisee's acceptance.  If Franchisee rejects the New Franchise opportunity or if the franchise documents are not executed within the sixty (60) day period set forth above, MRTI is free to offer the New Franchise opportunity to a third party. Upon request, MRTI will provide Rubber Manufacturer Association figures for retread unit potential for New York or New Jersey as applicable.

## Section 4.  Conditions

4.1  Michelin's obligations set forth in this Agreement are subject to the following conditions:

(a)  Execution of Franchise Agreement and all other Transaction Documents;

(b)  Franchisee must have in effect at all times a Dealer Agreement with Michelin Americas Truck Tires Division and a Franchise Agreement with MRTI for each MRTI Shop and be and remain in good standing and not in breach or default of any warranty, covenant, representation, obligation or term thereunder or under the other Transaction Documents (as defined in the Franchise Agreement);

(c)  Franchisee ··must maintain its Evergreen status (as such program may be revised or replaced), including maintaining Michelin penetration above 50%; and

(d)  There must be no change in the ownership or management of Franchisee without the express prior written approval of Michelin.

4

## Section 5. <u>Franchisee Records, Inspection.</u>

5.1    Franchisee hereby grants and covenants to allow Michelin access to Franchisee's financial (including working papers) and inventory records to the extent reasonably necessary for Michelin to determine Franchisee's compliance with the provisions of this Agreement. Upon request by Michelin, Franchisee shall permit representatives of Michelin to enter Franchisee's premises during normal business hours and inspect Franchisee's inventory and financial records in place and make photocopies thereof.    Franchisee hereby covenants to fully cooperate with Michelin regarding said inspection and further covenants to fully assist Michelin, if requested, during such inspection by providing explanations, answering questions, etc.

## Section 6.  <u>No Assignment.</u>

6.1    This    Agreement    is    personal    to    Franchisee    and    neither    the Agreement nor any right hereunder or interest herein may be assigned by Franchisee.    Michelin may without Franchisee's consent assign this Agreement, or any portion hereof, to one or more of its affiliates, in which event Michelin will furnish Franchisee written notice of such assignment.

## Section 7. <u>No Implied Waivers.</u>

7.1    Failure by either party to enforce or exercise any of its rights under any provision of this Agreement shall not be construed as a waiver of such rights nor as affecting in any way the effectiveness of such provisions nor as affecting that party's    rights or powers and remedies under this Agreement.    The exercise of any rights or enforcement of any right or remedy by any party    under this Agreement shall not limit or affect that party's rights or powers to thereafter exercise the same or any other rights or to enforce the same or any other right or remedy.

## Section 8.  <u>Severability.</u>

8.1    Any    provision    of    this    Agreement    which    is    prohibited    or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

## Section 9.  <u>Miscellaneous.</u>

9.1    <u>Choice of Law, Venue, Jurisdiction</u>.  This Agreement and all issues arising from or relating to this Agreement shall be governed by and construed under the laws of the State of South Carolina, without regard to the application of South Carolina conflict of law principles.    Franchisee agrees that the state or federal court of general jurisdiction in the judicial district in which Michelin has its principal place of business at the time of commencement of proceedings shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement.    Franchisee irrevocably submits to the jurisdiction of such courts and waives any objections to either the jurisdiction of or venue in such courts.

9.2  Modification. This Agreement may not be modified or amended except by an instrument in writing executed by both parties. The parties hereby agree to execute an amendment to the Agreement, from time to time, as they may deem reasonably necessary to reflect the intent of the parties.

9.3  Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument; and, this Agreement may be delivered by telecopy transmission and each party hereto may rely thereon and the telecopy of this Agreement and any related documents shall be enforceable against the party delivering the same.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate, each counterpart being deemed an original, by their respective duly authorized officers, as of the day and year first written above.

Michelin North America, Inc.,
a New York corporation

By: _____

Name: _____
            LUC M. MINGUET
Title: _____
          CHIEF OPERATING OFFICER

Michelin Retread Technologies, Inc.,
a Delaware corporation

By: _____

Name: _Thomas M Brennan_____

Title: _President_____


Inter-City Retread, Inc.,
a New Jersey corporation

By: _____

Name: _Neil Erbesh_____

Title: _President_____

6

EXHIBIT 1
MICHELIN TRUCK CENTER SUPPORT FUND CHART
AS DEFINED IN SECTION 2.1 OF THE SALES SUPPORT AGREEMENT

| MSPN | SIZE & LR | TREAD DESIGN | PR | LR | SUPPORT AMOUNT |
|---|---|---|---|---|---|
| 90348 | 445/50R22.5 | XDA | 20 | L | $25.00 |
| 80726 | 445/50R22.5 | XDA-HT | 20 | L | $25.00 |
| 41444 | 455/55R22.5 | XDA-HT | 20 | L | $25.00 |
| 49694 | 445/50R22.5 | XTA | 20 | L | $25.00 |
| 59070 | 445/50R22.5 | XTE | 20 | L | $25.00 |
| 82791 | 455/55R22.5 | XTE | 20 | L | $25.00 |
| 94030 | 11R22.5 | XZA2 | 14 | G | $25.00 |
| 94476 | 11R24.5 | XZA2 | 14 | G | $25.00 |
| 84597 | 275/80R22.5 | XZA2 | 14 | G | $25.00 |
| 78216 | 275/80R24.5 | XZA2 | 14 | G | $25.00 |
| 93430 | 11R22.5 | XDA-HT | 14 | G | $25.00 |
| 81937 | 11R24.5 | XDA-HT | 14 | G | $25.00 |
| 59777 | 11R24.5 | XDA-HT | 16 | H | $25.00 |
| 50575 | 275/80R22.5 | XDA-HT | 14 | G | $25.00 |
| 55519 | 275/80R24.5 | XDA-HT | 14 | G | $25.00 |
| 93834 | *11R22.5 | XZA-1B | 14 | G | $5.00 |
| 49235 | *11R24.5 | XZA-1B | 14 | G | $5.00 |
| 90907 | *275/80R22.5 | XZA-1B | 14 | G | $5.00 |
| 89975 | *275/80R24.5 | XZA-1B | 14 | G | $5.00 |
| 37895 | *11R22.5 | XDHT | 14 | G | $5.00 |
| 37556 | *11R24.5 | XDHT | 14 | G | $5.00 |
| 33236 | *275/80R22.5 | XDHT | 14 | G | $5.00 |
| 13196 | *275/80R24.5 | XDHT | 14 | G | $5.00 |
| 99141 | 10R22.5 | XZE | 14 | G | $20.00 |
| 62165 | 11R22.5 | XZE | 14 | G | $20.00 |
| 95283 | 11R22.5 | XZE* | 16 | H | $20.00 |
| 93749 | 11R24.5 | XZE | 14 | G | $25.00 |
| 65618 | 11R24.5 | XZE* | 16 | H | $25.00 |
| 61737 | 255/70R22.5 | XZE* | 16 | H | $17.50 |
| 73348 | 275/80R22.5 | XZE | 14 | G | $20.00 |
| 57425 | 275/80R24.5 | XZE | 14 | G | $25.00 |
| 47951 | 12R24.5 | XZY 3 | 16 | H | $25.00 |
| 47396 | 11R24.5 | XZY-2 | 16 | H | $25.00 |
| 42333 | 315/80R22.5 | XZY-2S | 20 | L | $25.00 |
| 53779 | 385/65R22.5 | XZY-3 WB | 18 | J | $25.00 |
| 40321 | 425/65R22.5 | XZY-3 WB | 20 | L | $25.00 |
| 83691 | 445/65R22.5 | XZY-3 WB | 20 | L | $25.00 |
| 77416 | 11R22.5 | XDY-2 | 16 | H | $25.00 |
| 72631 | 11R24.5 | XDE A/T | 16 | H | $25.00 |

7

1 r

## EXHIBIT 2

**Non-NAFA Michelin Units shall be defined as :**

| Gross Units | Total tires shipped to the dealer (in all cases, net of returns) |
|---|---|

Less --------------------------------------------------------------------------------------------------

| | |
|---|---|
| Natl. Acct Units | Michelin Truck Tire units delivered to a Michelin NAFA fleet and processed on a DR. |
| **Less** | |
| OE – TS Units | Michelin Truck Tire units stock transferred for programs such as USED Truck |
| **Less** | |
| OS Units | OE DSP - Truck Tires delivered to OE by the dealer for special programs |
| **Less** | |
| Govt Units | Michelin Truck Tire units delivered to a Michelin government fleet and processed on a DR. |
| **Less** | |
| Utility Units | Michelin Truck Tire units delivered to a Michelin Public Utility fleet and processed on a DR. |
| **Less** | |
| Bonus Return Units | Michelin Truck Tire units returned to a Michelin DC with a return authorization. |
| **Less** | |
| Bonus Warr Adj Units | Michelin Truck Tire units approved for warranty and processed on a Michelin warranty claim form. |
| **Less** | |
| Bonus GS Units | Michelin Truck Tire units delivered to a Michelin government fleet and price supported on a GS form. |
| **Less** | |
| Bonus GU Units | Michelin Truck Tire units delivered to a Michelin public utility fleet and price supported on a GS form. |
| | |
| **Non-NAFA Units** | **Total Non-NAFA Michelin Units** |

## Exhibit 3

**MRTI Goals**

| Year | Pounds of Pre-Mold Tread Rubber Purchased |
|------|--------------------------------------------|
| 2005 | 500,000 lbs. |
| 2006 | 500,000 lbs. |
| 2007 | 500,000 lbs. |
| 2008 | 250,000 lbs. (first half of year) |

**Counties in New Jersey**

Passaic
Bergen
Morris
Essex
Hudson
Union
Somerset
Middlesex
Mercer
Monmouth
Sussex

**Counties in New York**

Westchester
Bronx
New York
Queens
Kings
Richmond
Ulster
Dutchess
Nassau
Suffolk
Rockland
Orange
Putnam

## PERSONAL COVENANTS

In consideration of, and as an inducement to, the execution of the Franchise Agreement dated as of _November 1____, 2005 (the "Agreement") by and between MICHELIN RETREAD TECHNOLOGIES, INC. ("MRTI") and Inter-City Retread, Inc. ("Franchisee") and other good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, each of the undersigned owners of an interest in Franchisee hereby agrees personally to be bound by, and personally liable for the breach of, Sections 10, 11 and 12.04 of the Agreement and subject to the provisions of Section 16 of the Agreement as if the undersigned were the "Franchisee" thereunder.

**IN WITNESS THEREOF**, each of the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Agreement was executed.

**PERCENTAGE OF OWNERSHIP INTERESTS IN FRANCHISEE**

_100 %_

**GUARANTOR(S)**

_____
(Signature)
_Neil Erbesh_
(Print Name)

_____                    _____
                                             (Signature)

_____
(Print Name)

_____                    _____
                                             (Signature)

_____
(Print Name)

_____                    _____
                                             (Signature)

_____
(Print Name)

DATE: _October 31_, 2005

Subscribed and sworn to before me this _ day of _October 31_, 2005.

_____
Notary Public

My Commission expires: _May 8, 2008_

SUZANNE KAMIENSKI
NOTARY PUBLIC-NEW JERSEY
UNION COUNTY
MY COMMISSION EXPIRES MAY 8, 2008

A-7

May 2003

# ADDENDUM TO FRANCHISE AGREEMENT

The parties hereto are parties to a Michelin Retread Technologies, Inc. Franchise Agreement (the "Franchise Agreement"), dated November 1, 2005 between **Michelin Retread Technologies, Inc.** ("MRTI") and **Inter-City Retread, Inc.** ("Franchisee") and wish to amend the Agreement.  The Agreement is amended in consideration of the mutual agreements herein contained, and the parties hereto agree as follows:

## I. AMENDMENTS.

1.       Replace the definition of the term "Transaction Documents" found in Section 1.01 of the Franchise Agreement in its entirety with the following:

> "Transaction Documents" – This Agreement, any amendments or addenda thereto, any equipment leases, software licenses, and equipment purchase agreements between the parties, the Sales Support Agreement, the Michelin Dealer Sales Agreement, and any other agreement incorporating or incorporated into this Agreement."

2.       Section 2.01, Type of Franchise/Location.  Add the following sentence to the first paragraph of Section 2.01:

> "The street address identified herein is the same for all tenants of the complex within which the MRTI Shop is located and, for the avoidance of doubt, the term premises shall refer to that portion of the complex in which the MRTI Shop is located."

3.       Section 6.03, <u>MRTI Image</u>.  Add the following language to Section 6.03:

> "Notwithstanding the foregoing and for the avoidance of doubt, this provision shall not in any way limit Franchisee's ability to sell new tires and related services."

4.       Section 6.07, <u>Compliance With Laws</u>.  In paragraph two of Section 6.07 the first line after the words "notify MRTI in writing within" delete the word "two" and replace it with the word "five".

5.       Section 7.02, Local Advertising Cooperatives.  Franchisee's participation in any local advertising cooperative for Michelin Retread Shops shall be optional; provided that if Franchisee does participate in any such advertising cooperative, Franchisee will comply with the by-laws of such cooperatives.

6.       Section 8.05, <u>Security Interest</u>.

1.       In the second paragraph of this Section, delete the second sentence of paragraph two in its entirety which begins with the words "if Franchisee fails to promptly execute..."  and ends with "...for the benefit of MRTI."

2.       Add the following sentence to the end of Section 8.05:

> "MRTI will file a Uniform Commercial Code termination statement as to the security interest in the PMSI Collateral granted pursuant to this Section 8.05 upon payment in full, in indefeasible collected funds, by Franchisee of all obligations secured hereby."

7.       Section 8.06, <u>Records and Computer Systems</u>.  The last sentence of the first paragraph of Section 8.06 shall be deleted and replaced with the following:

> "All such books and records shall be kept at the premises of the Shop, or at the Franchisee's corporate headquarters, unless MRTI otherwise approves."

8.    Section 8.07, <u>Periodic Reports</u>.

In subpart (a), delete the words "no later than 30 days after the end of each month" and replace them with "upon request from MRTI".

In subpart (b):

1.    after the word "within" delete the phrase "90 days" and replace it with "120 days"; and

2.    after the words "end of each calendar year, " delete the words "an audited" and replace them with "a compiled".

9.    Section 12.01, <u>Transfer by Franchisee Subject to MRTI's Approval</u>.  Delete the first paragraph only in its entirety of Section 12.01 and replace it with the following:

"The rights and duties created by the Transaction Documents are personal to Franchisee or, if Franchisee is a business corporation, partnership, limited liability company or other legal entity, to Franchisee's Owners.  Accordingly, except as permitted by Section 12.07, Permitted Transfers, neither Franchisee nor any of Franchisee's Owners may Transfer the Franchise without MRTI's prior written approval and without complying with all of the provisions of Section 12.  Any transfer without such approval or compliance constitutes a breach of this Agreement and is void and of no force or effect.  Any Permitted Transfers shall be subject to the conditions set forth in Sections 12.02(a), (i) and (j) and 12.07 and the transferee shall agree to be bound by all of the provisions of the Transaction Documents, including the restrictive covenants set forth in Section 10, for the remainder of the Term."

10.    Section 12.07, Permitted Transfers.  Insert the following language as a new Section 12.07:

"12.07    <u>Permitted Transfers</u>.    Subject to the conditions set forth herein, the Owners may sell, assign or transfer shares of Franchisee to the children, brother, or parents of Neil N. Erbesh, provided, however, that in all cases that: Neil N. Erbesh retains voting control of at least 50.1% of the shares of Franchisee and that he continues to hold the office of President and continues to be responsible for Franchisee's day to day management.  The term shares refers to all issued and outstanding shares of stock in Franchisee.

The transfers of shares which are permitted pursuant to this Section 12.07 shall be referred to as "Permitted Transfers".  All Permitted Transfers shall be subject to the conditions in Sections 12.02(a), (i) and (j) and the transferee shall agree to be bound by all of the provisions of the Transaction Documents, including the restrictive covenants set forth in Section 10 of this Agreement, for the remainder of the Term."

11.    Section 13.01, Immediate Termination.  In the second sentence:

1.    after the words "if Franchisee becomes insolvent by reason of its inability to pay its debts as they mature" add the words  "and Franchisee has failed to cure such insolvency after the passage of 7 days following written notice from Franchisor";

2.    after the words "if final judgment against Franchisee in the amount of" delete the words "Fifty Thousand Dollars ($50,000) or more remains unsatisfied of record for 30 days" and replace them with "One Hundred Thousand Dollars ($100,000) or more remains unsatisfied of record and unbonded for 45 days"

3.    after the words "if suit is filed to foreclose any lien or mortgage against any of Franchisee's assets and such suit is not dismissed within" delete the words "30 days" and replace them with "45 days".

2

12.    Section 13.02, Termination by Franchise Upon Notice.  Section 13.02, subpart (j), shall be deleted in its entirety and replaced with:

"(j)    fails on three or more separate occasions (and MRTI has provided written notice to Franchisee of such failures) within any period of 12 consecutive months to comply with any one or more provisions of this Agreement or any mandatory specification, standard or operating procedure prescribed by MRTI, whether or not such failure is corrected after notice is delivered to Franchisee; or"

## II. EFFECTIVENESS.

This Addendum shall be effective as of _____November 1_____, 2005 when this Addendum has been executed and delivered by the parties.

## III. DEFINED TERMS.

All terms contained in this Addendum that are defined in the Franchise Agreement shall have the meanings assigned to them in the said Agreement.  Except as otherwise amended herein, all other terms and conditions of the Franchise Agreement shall remain unchanged.  When this Addendum becomes effective as provided in Article II hereof, all references in the Franchise Agreement to "this Agreement", "herein", "hereunder", and words of similar import, shall be deemed to be references to the Franchise Agreement as amended hereby.  Except as amended hereby, all other provisions of the Franchise Agreement will remain in full force and effect.

## IV. COUNTERPARTS.

This Addendum may be executed in any number of counterparts, all of which taken together shall constitute one instrument.  Either of the parties hereto may execute this Addendum by signing any such counterpart.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed as of the day and year first above written.

INTER-CITY RETREAD, INC.

By: _____

Name: Neil Erbesh

Title: President

MICHELIN RETREAD TECHNOLOGIES, INC.

By: _____

Name: Thomas M. Brennan

Title: President

3

SCHEDULE 1 - LIST OF MRTI EQUIPMENT

2 NDTs (Nail Detector Testing Machines)
1 X Ray Post (Imaging Machine and Spreader)
2  Single-Head Buffers
1 CIA (Casing Integrity Analyzer Shearography Machine)
5 Skiving & Filling Posts
8 Repair Posts (1 table and 2 spreaders per post)
1 Cement Booth
2 Pre-Mold Builders, with Temperature Control Units and Chillers and Extruders
2 Enveloping / De-enveloping Posts
1 Tilt Table
2 Curing Chambers (25 Tires)
2 Final Inspection Posts
1 Wide Casing Implementation Package
All necessary Monorail and components, including J-Hooks and Trollies and lifts
and tilt tables as needed.

INTER-CITY RETREAD, INC.,
a New Jersey corporation

By: _____
Print Name: Neil Erbesh
Title: President

MICHELIN RETREAD TECHNOLOGIES,
INC., a Delaware corporation

By: _____
Print Name: Thomas M. Brennan
Title: President

A-1

May 2003

SCHEDULE 2 - IDENTIFICATION OF FRANCHISEE ENTITY AND OWNERS

1.    Form of Entity of Franchisee.

(a)    Corporation. Franchisee was incorporated on September 1, 1999, under the laws of the State of New Jersey. It has not conducted business under any name other than its corporate name. The following is a list of all of Franchisee's directors and officers as of _October 21_, 2005.

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| Neil Erbesh | President |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(b)    Partnership. Franchisee is a [general] [limited] partnership formed on _____, _____ under the laws of the State of _____. It has not conducted business under any name other than its partnership name. The following is a list of all of Franchisee's partners as of _____, 20___.

N. E.

| Name of General Partner | Type of Partner |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(c)    <u>Other</u>.  Please specify. _____

2.    <u>Owners</u>.  Franchisee and each of its Owners represent and warrant that the following is a complete and accurate list of all Owners of Franchisee, including the full name, mailing address and social security number of each Owner, and fully describes the nature and extent of each Owner's interest in Franchisee.  Franchisee, and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his ownership interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| Owner's Name, Address and Social Security Number (or Federal Tax ID Number) | Description of Interest |
|---|---|
| *Neil Erbesh* | *100 % Stockholder* |
| Name | |
| *465 Ocean Ave   Lawrence, NY* | |
| Address | |
| *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* | |
| Social Security Number | |
| _____ | |
| Name | |
| _____ | |
| Address | |
| _____ | |
| Social  Security Number | |
| _____ | |
| Name | |
| _____ | |
| Address | |
| _____ | |
| Social Security Number | |

May 2003

*N. E.*

Submitted by Franchisee
on __October 31__ , 2005.

Accepted by MRTI and made a part of the
Franchise Agreement as of __November__
__1__ , 2005.

INTER-CITY RETREAD, INC.,
a New Jersey corporation

MICHELIN RETREAD TECHNOLOGIES,
INC., a Delaware corporation

By: _____

By: _____

Print Name: Neil Erbesh
Title: President

Print Name: Thomas M. Brennan
Title: President

Owners: _____
(Signature)

__Neil Erbesh__
(Print Name)

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

A-4

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is made as of the _9th_ day of September, 2004, by and between Michelin North America, Inc. (hereinafter "MNA"), Michelin Retread Technologies, Inc. (hereinafter "MRTI"), and Inter-City Tire & Auto Center, Inc. ("Inter-City Tire"), Inter-City Retread, Inc. ("Inter-City Retread") (both individually and collectively to be referred to hereinafter as "Inter-City").

The purpose of this Agreement is to provide a confidential framework in which the parties can discuss and negotiate the renewal of the franchisor/franchisee relationship between MRTI, an affiliate of MNA, and Inter-City (the "Negotiations"). Inter-City, MNA and MRTI each understand and acknowledge that these Negotiations are confidential and proprietary.

Inter-City, MNA and MRTI hereby agree to hold in confidence and maintain secret all discussions, information, letters, documents and offers related in any way to the Negotiations, including such information, discussions, presentations, documents, letters, offers which precede the date of this Agreement, and the existence of all of the foregoing (the "Confidential Information").

It is understood that no commitments, other than of maintaining confidentiality pursuant to this Agreement, have been made by the parties concerning the Negotiations, either in writing or verbally.

Inter-City further agrees that access to the Confidential Information shall be restricted to members of Inter-City's senior management. MNA and MRTI agree that access to the Confidential Information shall be restricted to employees and agents (including its attorneys and auditors) of MNA and MRTI who are involved, directly or indirectly, in the Negotiations and/or have a need to know the Confidential Information.

The obligations of confidentiality set forth in this Agreement shall not apply to any item of Confidential Information which: (i) the receiving party can reasonably demonstrate was already known by it at the time of disclosure and was not obtained directly or indirectly from the disclosing party; (ii) is public knowledge or becomes public knowledge or is published through no fault of either party; (iii) or is disclosed by a third party who is under no confidentiality obligation to either party with respect to such Confidential Information.

The parties agree that no public announcement or disclosure pertaining to the Negotiations shall be made by either party unless it has first been approved by the other party, or unless, in the reasonable opinion of counsel for the disclosing party, disclosure is required by law or legal process. In the event of the latter, the party required by law or legal process to disclose shall immediately notify the other party, in order that the parties can work together to limit the scope and nature of the disclosure as much as possible.

In the event the Negotiations are concluded or otherwise terminated, the parties will cease their discussions about the Negotiations, and each receiving party will return to the furnishing party any and all Confidential Information furnished in writing during the Negotiations. Notwithstanding conclusion and/or termination of the Negotiations, all Confidential Information will continue to be subject to the terms of this Agreement. This Agreement shall remain in effect for a period of five (5) years from the date first given above.

In the event of a breach or threatened breach of this Agreement, the non-breaching party shall be entitled to preliminary and permanent injunctive relief to enforce any provision hereof, and nothing herein shall preclude either party from pursuing any action or other remedy, including costs and attorneys' fees, for any breach or threatened breach of this Agreement.

The provisions of this Agreement are independent and severable, and any provision deemed invalid or unenforceable shall not affect the validity or enforceability of any other provision. Nothing contained in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed to Inter-City by MNA or MRTI.

This Agreement will be construed in accordance with the laws of the State of South Carolina, without regard to its conflict of law provisions, and that any dispute arising hereunder shall be submitted only to a state or federal court of competent jurisdiction in South Carolina, to whose jurisdiction the parties consent.

     This Agreement constitutes and expresses the entire Agreement and understanding among the parties hereto as to the subject matter herein. Any modifications hereto must be made by written agreement signed by all parties.

**INTER-CITY TIRE & AUTO CENTER, INC.**

BY:_____

NAME:_____

TITLE:_____

DATE:_____

**INTER-CITY RETREAD, INC.**

BY:_____

NAME: _Neil Evbesh_

TITLE: _President_

DATE: _9/9/04_

**MICHELIN NORTH AMERICA, INC.**

BY:_____

NAME: _P. Tomas Diez._

TITLE: _VP Commercial Sales._

DATE: _09/10/04._

**MICHELIN RETREAD TECHNOLOGIES, INC.**

BY:_____

NAME: Thomas M. Brennan

TITLE: President

DATE: _9/9/04_

Non-Exclusive Software License

The present non-exclusive license, effective as of __November 1__ 2005, is made between Michelin Retread Technologies, Inc., a Delaware corporation, having a place of business at 632 Inglesby Parkway, Duncan, South Carolina 29334 ("MRTI"), and Inter-City Retread, Inc., a New Jersey corporation, having a place of business at 777 Dowd Avenue, Elizabeth, New Jersey 07201 ("Franchisee").

I. Definition

Licensed Software – analytical software provided by MRTI to Franchisee for use in a shearography machine purchased from MRTI.

II. License

Franchisee shall have a site specific license to use the Licensed Software provided by MRTI solely in conjunction with a shearography machine purchased from MRTI by Franchisee and operated by Franchisee at the Michelin Retread Shop, pursuant to the MRTI Franchise Agreement entered into as of __November 1__, 2005 ("Franchise Agreement"). Franchisee cannot assign or transfer this license, which MRTI will also make available to other Franchisees.

III. License Fee

The license fee for the use of the Licensed Software shall be $250 (U.S.) per unit, per month. For administrative ease of both parties, the license fee shall be billed and collected, on an annual basis, in advance. MRTI reserves the right to reasonably change the license fee at any time.

IV. Prohibitions

Franchisee may not copy, alter, amend, reverse engineer, decompile, transmit to a third party, use at an unauthorized site, or sublicense the Licensed Software.

V. Requirements

Franchisee must permit MRTI to upgrade, patch, or replace the Licensed Software as MRTI deems necessary, in MRTI's sole discretion, without compensation to Franchisee.

VI. Termination

The present license shall terminate upon expiration or termination of the Franchise Agreement, unless earlier terminated by MRTI upon thirty (30) days written notice for violation by Franchisee of any provision of this license, or violation by Franchisee of any provision of the Franchise Agreement.

Upon termination of this license, Franchisee shall immediately cease using the Licensed Software, and immediately return it, with all MRTI accompanying materials (including copies of said materials) to MRTI. Franchisee agrees that MRTI may enter its premises, without necessity of legal process, both in-person and by remote electronic access, to delete or remove the Licensed Software and MRTI accompanying materials. Franchisee will offer its full cooperation to MRTI in effecting removal of the software and the MRTI accompanying materials.

VII. Confidentiality

All Licensed Software, and all accompanying materials provided by MRTI, are confidential and proprietary information to MRTI. Franchisee must take all reasonable precautions to keep said information confidential.

VIII. No Warranty

The Licensed Software is provided "as is." Neither party shall be liable for any consequential, punitive, or special damages arising from the use by Franchisee of the Licensed Software.

IX. No Rights to Marks

Franchisee does not have any right pursuant to this license to use any trademark, trade name, service mark, or logo of MRTI or companies affiliated with MRTI.

X.  Choice of Law, Venue, Jurisdiction

This license and all issues arising from or relating to this license shall be governed by and construed under the laws of the state of South Carolina, without regard to choice of law principles.  Franchisee agrees that the state or federal court of general jurisdiction in the judicial district in which MRTI has its principal place of business at the time of commencement of proceedings shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this license.

Franchisee irrevocably submits to the jurisdiction of such courts and waives any objections to either the jurisdiction of or venue in such courts.

XI. Notices

If to MRTI:

Michelin Retread Technologies, Inc.
632 Inglesby Parkway
Duncan, SC  29334
Attention:  Director, Franchise Compliance

If to Franchisee:

Inter-City Retread, Inc.
777 Dowd Avenue
Elizabeth, New Jersey 07201
Attention: President

In witness whereof, the parties affix their signatures:


**MICHELIN RETREAD TECHNOLOGIES, INC.,**
a Delaware corporation

By: _____
Print Name:  Thomas M. Brennan
Title: President


**INTER-CITY RETREAD, INC.,**
a New Jersey corporation

By: _____
Print Name: Neil Erbesh
Title: President



November 9, 2005

Mr. Neil Erbesh
Inter-City Retread, Inc.
777 Dowd Avenue
Elizabeth, New Jersey 07201

Re:  Inter-City Retread, Inc. ("Inter-City")

Dear Neil:

This letter is issued in connection with the Franchise Agreement dated November 1, 2005 between Inter-City Retread, Inc. and Michelin Retread Technologies, Inc., referred to herein as the "Agreement".

This letter confirms that the Franchise Agreement dated January 5, 2000 between the parties was in effect through and including October 31, 2005 until the new Agreement became effective.

Please acknowledge your agreement by signing in the space provided below.

Sincerely,

Michelin Retread Technologies, Inc.

By: _____
Thomas M. Brennan
Its:  President

ACKNOWLEDGED AND ACCEPTED:

Inter-City Retread, Inc.

By: _____
Neil Erbesh
Its:  President
Date:  __11/9/05__

One Parkway South
P.O. Box 19001
Greenville, South Carolina 29602-9001
Tel: 864 / 458-5000 Main Number
     864 / 458-5954 Tom Brennan Direct



Michelin North America, Inc.
One Parkway South
Greenville, South Carolina 29615

# MICHELIN®

January 17, 2005

Mr. Neil Erbesh
Inter-City Retread, Inc.
777 Dowd Avenue
Elizabeth, NJ 07201

Re:  Franchise Agreement dated January 5, 2000– MRTI Franchise

Dear Neil:

Inter-City Retread, Inc. ("Inter-City") and Michelin Retread Technologies, Inc. ("MRTI") are parties to a Franchise Agreement dated January 5, 2000 with a term of five years ("Franchise Agreement") and a Pre-Mold Equipment Lease dated January 5, 2000 with a term of five years ("Equipment Lease"). The parties are conducting franchise renewal discussions and wish to extend the term of the Franchise Agreement, and Equipment Lease through and including February 18, 2005.

Accordingly, by their authorized signatures below, this letter confirms that the expiration dates of January 28, 2005 for the Franchise Agreement and Equipment Lease are hereby amended and replaced with the date of February 18, 2005.  Please sign and return both originals of this letter, and we will then send back to you one fully-executed original for your files.

Very truly yours,

Michelin North America, Inc.          Michelin Retread Technologies, Inc.

By: _____          By: _____
                                          Thomas M. Brennan
Its: _____          Its:    President

ACCEPTED AND AGREED:

Inter-City Retread, Inc.

By: _____
      Neil Erbesh
Its:  President

Date: 2/1/05